INFINITY OUTDOOR, INC., Plaintiff,

v.

**CITY OF NEW YORK, Satish K. Babbar, and Ann McCarthy, Defendants.**

No. 01 CV 1521(NG).

United States District Court, E.D. New York.

Oct. 11, 2001.

Floyd Abrams, New York City, for plaintiff.

Lawrence S. Kahn, Deborah R. Rand, New York City, for defendant.

### OPINION AND ORDER

GERSHON, District Judge.

Plaintiff, an outdoor advertising company, brings this action challenging the constitutionality of the Zoning Resolution of the City of New York, as amended in 2001, and companion enforcement legislation. Plaintiff alleges that the Zoning Resolution unconstitutionally burdens commercial speech in violation of the First Amendment by banning advertising signs, but permitting, subject to regulation, non-commercial signs near highways and parks and that the Zoning Resolution violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by allowing certain types of non-commercial signs anywhere in the City. Plaintiff also challenges the enforcement legislation as an unconstitutional prior restraint, as impermissibly vague, as imposing civil penalties without a *scienter* requirement in violation of the Due Process Clause of the Fourteenth Amendment, and as imposing excessive fines in violation of the Eighth Amendment.[1] The defendants are the City of New York; Satish K. Babbar, the Acting Commissioner of the New York City Department of Buildings ("DOB"); and Ann McCarthy, the Executive Director of the New York City Environmental Control Board. Plaintiff moves for summary judgment pursuant to Fed. R.Civ.P. 56 on all of its claims except the excessive fines claim. Defendants move for summary judgment on all of plaintiff's claims. The New York Civil Liberties Union has filed an *amicus curiae* brief in support of plaintiff's motion for summary judgment, and the Municipal Art Society has filed an *amicus curiae* brief in support of defendants' motion for summary judgment.

## I. FACTS AND BACKGROUND

There is no disputed issue of material fact.

The core provision of the Zoning Resolution challenged by plaintiff is the prohibition on placing off-site commercial signs near highways and public parks. New York City, like many other municipalities, divides signs into three categories. Off-site commercial signs, called "advertising signs" in the Zoning Resolution, are signs that direct attention to a business that is not located on the same lot as the sign. On-site commercial signs, called "accessory use signs," are signs that identify a business located on the same lot as the sign. Finally, non-commercial signs direct attention to something other than a business or commodity. Under the Zoning Resolution, non-commercial and on-site commercial signs are allowed near highways and parks, but off-site commercial signs are not. Plaintiff argues that this regulation

---

1. Specifically, plaintiff alleges that 1) Zoning Resolution ("ZR") §§ 12–10, 32–661, 32–662, 42–55 and 42–58 unconstitutionally burden commercial speech in violation of the First Amendment; 2) Section 3 of Local Law 14, to be codified at New York City Administrative Code §§ 26–253 to 26–255, violates the First Amendment by imposing a prior restraint on speech; 3) ZR § 12–10 is unconstitutionally vague; 4) ZR §§ 22–332, 32–62, and 42–52 violate the Equal Protection Clause of the Fourteenth Amendment; 5) Intro. 809–A, to be codified at Administrative Code § 26–256, violates the First Amendment and the Due Process Clause of the Fourteenth Amendment by imposing civil penalties without a *scienter* requirement; and 6) Intro. 809–A, to be codified at Administrative Code §§ 26–256, 26–262(a), and 26–262(e), imposes excessive fines in violation of the Eighth Amendment.

impermissibly favors non-commercial speech over commercial speech. In addition, plaintiff challenges the provisions of the Zoning Resolution allowing non-commercial organizations, which may be located in any district, to display certain types of signs on their lots.

Plaintiff also challenges the implementation of the City's sign regulations, which require a permit before a sign can be displayed. As part of the permitting process, the DOB categorizes a proposed sign as an accessory, advertising, or non-commercial sign. The implementing regulations contain a presumption that signs placed by non-commercial speakers are non-commercial, but non-commercial messages by commercial entities also are treated as non-commercial. The DOB must act upon an application within 40 days or, if there is good cause for an extension, 60 days, and unsuccessful applicants may appeal a decision to the Board of Standards and Appeals ("BSA"), which must act "expeditiously." Finally, plaintiff challenges newly enhanced civil penalties of up to $15,000 for the first day of violation of the sign regulations and $25,000 for each subsequent day of violation.

While this summary of the current state of the challenged provisions of the Zoning Resolution provides an overview, the issues presented cannot be fully understood without an excursion into the history of the City's sign regulations.

## A. EARLY REGULATION OF SIGNS

In 1916, New York City became the first municipality in the United States to implement a comprehensive zoning resolution, which included limited regulation of signs. *See Major Reports of the City Planning Commission* 85 (1940). In 1940, the City Planning Commission amended the Zoning Resolution to create the central provision that plaintiff challenges here: the prohibi-

tion of most off-site commercial signs within 200 feet of a public park or designated highway if the sign is visible from the park or highway. *See* New York, N.Y., Zoning Resolution ("ZR") § 21-B (1940), *renumbered* §§ 32-66, 42-53 (1961), *renumbered* §§ 32-662, 42-55 (2001). The list of designated highways, now called "arterial highways," has expanded over the years and includes such thoroughfares as the approaches to the Holland, Lincoln, and Queens–Midtown Tunnels, the approaches to the George Washington, Brooklyn, and Manhattan Bridges, Queens and Northern Boulevards, the Bruckner and Brooklyn–Queens Expressways, the West Side Highway, and the FDR Drive.

The heart of the Zoning Resolution's regulation of signs since 1940 has been the distinction between off-site commercial and on-site signs. Since 1940, an off-site commercial sign has been called an "advertising sign." It is now defined as "a sign that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same zoning lot and is not accessory to a use located on the zoning lot." ZR § 12-10 (2001). However, the term for on-site signs, which are signs that direct attention to a business or profession conducted upon the premises, has changed. Under the 1940 amendments to the Zoning Resolution, on-site signs were called "business signs," but now they are referred to as "accessory use" signs. *See* ZR § 3(q) (1940), *renumbered* § 12-10 (1998).

Since 1940, each type of sign has been subject to different regulations. The 1940 ordinance did not permit off-site signs in residential or some commercial districts; permitted but regulated on-site signs in these districts; and permitted all signs in some commercial districts such as Times Square. Former ZR §§ 4(49), 4-D, 4-E (1940). Off-site signs were prohibited near

highways and parks, but on-site signs were permitted without restriction. ZR §§ 3(q), 21–B (1940), *renumbered* §§ 32–662, 42–55 (2001).

The City's limitation on signs near highways and parks was adopted for the purpose of improving traffic safety and aesthetics in the City. Not only did the City seek to produce quality of life benefits for residents and visitors, but it also sought to produce economic benefits by increasing the number of residents and visitors. The City Planning Commission found that "[b]illboards and signs not only dominate our business streets ... but they take advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches." *Major Reports of the City Planning Commission* 90 (1940). The City's concern with the proliferation of signs led to a general prohibition on signs in residential and commercial districts. However, the City excluded certain commercial districts, such as Times Square, in order to increase tourism and promote commerce. The City Planning Commission also excluded on-site signs from the general prohibition because it found that the needs of businesses to identify their locations on particular lots outweighed the City's aesthetic and traffic safety interests. *See id.*

In the 1961 amendments to the Zoning Resolution, the City maintained the ban on advertising signs within 200 feet of a highway or public park, and began to regulate the size of advertising signs beyond 200 feet of highways and public parks. The Zoning Resolution, as amended in 1961, provided that in all manufacturing and commercial districts where advertising signs are permitted:

> no advertising sign shall be located, nor shall an existing advertising sign be structurally altered, relocated, or reconstructed within 200 feet of an arterial highway or of a public park with an area of one-half acre or more, if such advertising sign is within view of such arterial highway or public park..... [B]eyond 200 feet from such arterial highway or public park, an advertising sign shall be located at a distance of at least as many linear feet therefrom as there are square feet of surface area on the face of such sign.

ZR §§ 32–66, 42–53 (1961), *renumbered* §§ 32–662, 42–55 (2001).[2]

Although, since 1940, signs bearing non-commercial copy had been included in the Zoning Resolution's broad definition of signs, the Zoning Resolution addressed where on-site and off-site commercial signs were permitted, but made no separate provision for non-commercial signs. Because of this failure to provide for the placement of non-commercial signs, the Zoning Resolution was eventually declared unconstitutional. In 1997, the New York State Supreme Court, Kings County, found that the Zoning Resolution violated the Supreme Court's seminal billboard case, *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). *See City of New York v. Allied Outdoor*, 172 Misc.2d 707, 714–15, 659 N.Y.S.2d 390 (1997).

In *Metromedia*, the Supreme Court had addressed a San Diego ordinance that prohibited off-site commercial and non-commercial signs throughout the city, but allowed on-site signs. The plurality found that the distinction between off-site com-

---

**2.** In 1980, the City grandfathered, *i.e.,* granted legal non-conforming status to, existing signs that did not comply with the Zoning Resolution. *See City Planning Commission Report* (Jan. 30, 1980).

mercial and on-site commercial signs was constitutional, but that, by allowing on-site commercial signs while prohibiting non-commercial signs, the statute impermissibly favored commercial speech over non-commercial speech. The plurality also held that twelve exceptions to the general prohibition against non-commercial signs unconstitutionally discriminated among types of non-commercial speech. *See Metromedia*, 453 U.S. at 503–15, 101 S.Ct. 2882.[3]

In *Allied Outdoor*, the Court held that, since signs are permitted only to the extent provided for in the Zoning Resolution, and the Zoning Resolution provided only for advertising and business signs, non-commercial signs generally were not allowed. As a result, the Zoning Resolution violated *Metromedia* by favoring commercial speech over non-commercial speech. In response to the *Allied Outdoor* decision, the City amended the Zoning Resolution in 1998.

## B. 1998 AMENDMENTS TO THE ZONING RESOLUTION

While the City continued to regulate signs near public parks and highways in order to combat the traffic safety and aesthetic problems created by these signs, it responded to *Metromedia* and *Allied Outdoor* by ensuring that "signs containing solely non-commercial speech will be treated in a uniform manner as signs re-

lating to commercial uses or activities located on the zoning lot." *City Planning Commission Report* 5–6 (Feb. 18, 1998). The City amended the Zoning Resolution §§ 32–62 and 42–52 to provide for non-commercial signs, rather than just advertising and accessory signs.[4] Under the amended Zoning Resolution: 1) in manufacturing districts, non-advertising signs, that is, accessory and non-commercial signs, are permitted without restriction, even near highways and parks, ZR § 42–52 (1998); 2) in manufacturing districts, advertising signs are also permitted without restriction, except near highways and parks, ZR § 42–52, § 42–53 (1998), *renumbered* § 42–55 (2001); 3) in commercial districts, non-advertising signs are permitted, subject to size, illumination, and projection limits, even near highways and parks, ZR § 32–62 (1998); and 4) in commercial districts, advertising signs are permitted, subject to size, illumination, and projection limits, only in some districts, but in these districts, advertising signs are prohibited near highways and parks, ZR §§ 32–63, 32–66 (1998), *renumbered* § 32–662 (2001).

Thus, the amended Zoning Resolution continues to prohibit advertising signs near highways and parks and to permit accessory signs, but now provides for non-commercial signs. As with accessory signs, it permits non-commercial signs near highways and parks. *See* ZR §§ 32–

3. A four Justice plurality reached these conclusions. Two Justices concurred that the ordinance was unconstitutional, but disagreed with the plurality's separate treatment of commercial and non-commercial speech. *Metromedia*, 453 U.S. at 536, 101 S.Ct. 2882. Three dissenting Justices, in separate opinions, found the ordinance constitutional on the ground that a total ban on billboards would be permissible and, since the exception for on-site signs did not discriminate on the basis of viewpoint, the exception did not ren-

der the ordinance unconstitutional. *See id.* at 553–68, 101 S.Ct. 2882.

4. Under the Zoning Resolution, as amended in 1998, "[a] 'sign' is any writing ..., pictorial representation ..., emblem ..., flag ..., or any other figure or similar character, that: (a) is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure; (b) is used to announce, direct attention to, or advertise; and (c) is visible from outside a building ...." ZR § 12–10 (1998).

66, 42–53 (1998), *renumbered* §§ 32–661, 32–662, 42–55 (2001). Plaintiff challenges these sections under the First Amendment as impermissibly distinguishing between commercial and non-commercial speech.

Finally, there are certain exceptions to the general restrictions, which, in varying forms, have been in effect for many years. For example, the Zoning Resolution permits one identification sign of limited size on hotels, professional offices, and parking garages; illuminated signs of limited size on hospitals; and "for sale" signs of limited size in residential districts. ZR §§ 22–32, 22–33 (1998). And Zoning Resolution § 22–332 and § 32–62 permit, without limitation, "flags, banners or pennants other than those that are advertising signs, located on any zoning lot used primarily for community facility uses of a civic, philanthropic, educational or religious nature" in all districts. ZR §§ 22–332, 32–62 (1998). This exception, which has been in effect since 1940, recognizes the use of community facilities for non-commercial purposes and of the need that these facilities have to use signs to facilitate such gatherings. *See City Planning Commission Report* 11–12 (Feb. 18, 1998). Plaintiff challenges the exception for community facilities as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment on the ground that it favors certain types of non-commercial speech over other types of non-commercial speech.

## C. 2001 AMENDMENTS TO THE ZONING RESOLUTION

After extensive hearings, and numerous submissions from public officials, community leaders, and representatives of the outdoor advertising industry, the City Council adopted amendments to the Zoning Resolution once again on February 27, 2001. The reason for these amendments was the proliferation in the number and size of signs that had resulted from new technologies and the "rampant illegality and lack of effective enforcement" that threatened the City's aesthetic appeal and traffic safety. *City Planning Commission Report* 2–8, 30 (Dec. 13, 2000); *Hearing Before the New York City Council Subcommittee on Zoning & Franchises* 11, 16–18 (Jan. 9, 2001). The City Planning Commission found that new technologies, such as light weight vinyl materials, have allowed for the production of larger sign structures at a lower cost and for the placement of these sign structures on new surfaces, such as water towers and the faces of buildings. The impact of these new technologies has been particularly pronounced in manufacturing districts, where there had been no limits on signs beyond 200 feet of highways and parks. Unlike the situation when the Zoning Resolution was originally enacted, by 2001, outdoor advertising companies could economically erect sign structures in manufacturing districts that were large enough to reach audiences in other districts with the new technologies.

The harm caused by these signs of unlimited size was compounded by the fact that, as manufacturing districts increasingly allowed for mixed uses, particularly in SOHO, NOHO, and Tribeca, more and more people were living and working in these districts. *See City Planning Commission Report* 2–4 (Dec. 13, 2000); *Hearing Before the City Planning Commission* 10–11, 79 (Nov. 29, 2000). As a result, one City Council Member, Kathryn Freed, testified before the City Planning Commission that in mixed use manufacturing districts:

[o]utdoor advertising has turned our neighborhoods into pages from a magazine, destroying our streetscapes, shining lights into our apartments, disfigur-

ing our landmarks, bombarding our senses. It has stolen our sense of community, blasting a cacophony of advertising messages that drowns out all other information. We can no longer enjoy a walk through our own neighborhood without these monster signs shouting at us from every corner. We are losing sleep at night because our bedrooms are lit up like Yankee Stadium. Our neighborhoods have become a nightmarish streetscape out of the movie *Bladerunner*, where every inch of every surface is covered in advertisements. The invasion of this advertising into every pore of our bodies and into every moment of our existence must be stopped.

*Hearing Before the City Planning Commission* 10–11 (Nov. 29, 2000).

In addition, the City Planning Commission heard testimony that, near highways and parks, there was a common practice of obtaining permits for accessory use signs and then illegally converting the signs to advertising signs in violation of the Zoning Resolution, and that this had caused a proliferation of advertising signs. *See City Planning Commission Report* 30 (Dec. 13, 2000); *Hearing Before the City Planning Commission* 3, 6 (Nov. 29, 2000). For example, testimony from the Brooklyn Deputy Borough President Jeanette Gadsden indicated that the number of advertising signs within 200 feet of an arterial highway in Brooklyn increased from 26 in 1994 to 140 in 2000. *Hearing Before the City Planning Commission* 3, 6 (Nov. 29, 2000); *City Planning Commission Report* 22 (Dec. 13, 2000). And data provided to the DOB by the Hudson River Park Trust indicated that, of the 41 complaints regarding signs along Miller Highway (the West Side Highway), four were non-advertising signs, one sign had been grandfathered, one sign was blank, and the remainder were in violation of the Zoning Resolution. Memorandum from Michael Bradley, Hud-

son River Park Trust, to Peter Prescod (Sept. 20, 1999). Even Timothy Stauning, President of New York Outdoor Group, an industry group to which plaintiff belongs, acknowledged that the practice of illegally converting accessory use signs to advertising signs is common. *Hearing Before the City Planning Commission* 73–76 (Nov. 29, 2000).

In response to this problem, the City reduced the economic incentive to illegally convert accessory signs to advertising signs, by limiting the size of accessory signs near highways and parks. The City concluded that, if the size of accessory signs were smaller, outdoor advertising companies would be less willing to obtain permits for accessory signs and then switch the copy to advertising. *See City Planning Commission Report* 30 (Dec. 13, 2000); *Hearing Before the City Planning Commission* 4, 8 (Nov. 29, 2000).

However, the City Planning Commission was careful not to eliminate all signs. Recognizing the importance of the outdoor advertising industry to the City and the importance of allowing merchants to reach their customers through advertisements, the City ensured that some signs would continue to be permitted in some locations. The City merely sought to combat the signs that caused the most aesthetic and traffic safety harm: all advertising signs near highways and parks and the megasigns that had developed in manufacturing districts. *See City Planning Commission Report* 32–33 (Dec. 13, 2000).

Thus, the 2001 amendments to the Zoning Resolution contain three central provisions. First, the amendments add size, illumination, and projection limitations on all signs in manufacturing districts, but exempt non-advertising flags, banners, and pennants located on lots used primarily for community facility uses of a civic, philan-

thropic, educational, or religious nature, as they are exempted in commercial and residential districts. ZR §§ 42–53, 42–54 (2001). Second, the amendments grant non-conforming use status to signs in manufacturing districts for which the DOB had issued permits and which had been erected before December 13, 2000, so long as the signs are not near a highway or park. ZR § 42–58 (2001). Finally, the amendments limit the size of non-advertising signs within 200 feet of a highway or park to 500 square feet and "[b]eyond 200 feet from such arterial highway or public park, the surface area of such signs may be increased one square foot for each linear foot such sign is located from the arterial highway or public park." ZR §§ 32–661, 42–55 (2001).

In sum, under the current Zoning Resolution, advertising signs are allowed, subject to regulation of size and other qualities, in some commercial districts and all manufacturing districts, so long as they are not within 200 feet of an arterial highway or public park, or located at a distance from the highway or public park in linear feet equal to or greater than their size in square feet. Accessory signs and non-commercial signs are allowed in all commercial and manufacturing districts, but they are subject to stricter size regulations near highways and parks.

## D. ENFORCEMENT OF THE ZONING RESOLUTION

The Administrative Code requires a permit before a sign structure is erected, installed, altered, repaired or used. New York, N.Y., Administrative Code § 27–147 (2000) ("Administrative Code"). In order to obtain a permit, an applicant must certify that the proposed work complies with the Administrative Code and other applicable laws and regulations, including the Zoning Resolution. *Id.* at § 27–142. Fol-

lowing the 1998 amendments to the Zoning Resolution, the DOB conformed its permitting practices for signs near highways and parks to the 1998 Zoning Resolution, as amended. *See* Operations Policy and Procedure Notice # 10/99 ("OPPN # 10/99"). OPPN # 10/99 requires all applications for sign permits to identify whether the proposed sign near a highway or park is an advertising or non-advertising sign, whether the proposed sign is visible from an arterial highway or public park, the distance of the proposed sign from an arterial highway or public park, the proposed copy, and the size and location of the proposed sign. *See* OPPN # 10/99 § I, 1.

Before approving or issuing a sign permit for an application for a sign that is required to be examined or audited because of the proximity of the sign to an arterial highway or public park, the applicant must demonstrate that the sign is not an advertising sign. That is, the applicant must demonstrate that the sign is either a non-commercial sign or that the sign is accessory to a use on the zoning lot, as defined in section 12–10 of the Zoning Resolution.

1. Non-commercial Signs (Non–Advertising signs)

A sign that contains copy regarding a governmental, charitable, religious, civic, philanthropic and/or educational organization, event or message and that does not prominently or primarily feature or make reference to a for-profit entity and/or its product(s) will be presumed to be a non-advertising sign.

2. Accessory Signs (Non–Advertising Signs)

For all other signs, the applicant must establish the accessory relationship between the proposed sign and the use on

the zoning lot for which the sign is being erected (the "principal use").

OPPN # 10/99 § II.

A permit application must be acted upon within 40 days of submission, but the Commissioner of the DOB may, for good cause and upon written notification, extend the deadline by 20 days. Administrative Code § 27–191.[5] If the DOB denies an application, the applicant may seek review at the BSA pursuant to New York City Charter § 666(6)(a) (2000), and, after hearing the appeal, the BSA must render its decision "expeditiously." *Id.* at § 669(c). Plaintiff challenges this permitting scheme under the First Amendment as an unconstitutional prior restraint and as unconstitutionally vague.

On February 27, 2001, in conjunction with its amendments to the Zoning Resolution, the City Council amended the Administrative Code by adopting Intro. 809–A/Local Law 14 ("Intro. 809–A") to enhance enforcement of the Zoning Resolution's regulations within 200 feet of an arterial highway or public park in light of the expansion in the size and number of signs and the lack of effective enforcement mechanisms. Prior to Intro. 809–A, the maximum penalty that could be imposed for a violation was a criminal penalty of $5,000, which is between 4% and 50% of a month's revenue for a sign, and no injunctive relief was available to ensure the removal of violating sign structures. In order to obtain even this minimal penalty, the DOB must prosecute violations in the Criminal Courts, which the City views as an ineffective enforcement mechanism. The low penalty relative to the potential benefits of violating the Zoning Resolution led to the widespread practice of obtaining permits for accessory signs and then ille-gally converting these into advertising signs. In addition to this evasion, the City was concerned with the inability to hold outdoor advertising companies accountable for violating signs because, prior to Intro. 809–A, the City could seek enforcement only against building owners. *See Joint Report of Land Use Committee and the Subcommittee on Zoning and Franchises* 1 (Feb. 6, 2001); *Hearing Before the New York City Council Subcommittee on Zoning & Franchises* 16–23 (Jan. 9, 2001). Upon signing Intro. 809–A, Mayor Rudolph W. Giuliani stated, on March 19, 2001, that:

> [In 1940, the] City Planning Commission ... recognized that billboards and other signs along the highways are an aesthetic harm. As a result, the Commission adopted a provision, still in effect today, prohibiting advertising signs within view from, and within a distance of, two hundred feet from parks, parkways and express highways.... At the same time that it prohibited advertising signs, the City recognized in 1940 that its interests in traffic regulation and highway beautification should yield to allow accessory signs along the highways, in recognition of the legitimate needs of commercial enterprises. Accessory signs are signs that companies erect on their buildings to identify the building as a place of business.

Intro. 809–A enhances enforcement in several ways. First, it allows the Commissioner of the DOB, after notice and a hearing, to order the removal of sign structures that are near highways and parks in violation of the Zoning Resolution. Intro. 809–A § 26–127.3. Second, Intro. 809–A establishes a permitting scheme for

---

**5.** If an applicant withdraws his application to make a correction and then re-submits the application, the re-submitted application must be acted upon within 20 days. Administrative Code § 27–191.

the placement or maintenance of a sign in proximity to highways and parks which complements Administrative Code § 27–147 and the OPPN # 10/99 permitting scheme just described by adding a requirement that permits be renewed annually and that they expire automatically when the principal use of a lot containing an accessory sign is discontinued or when there is a change in the copy that the Commissioner has determined renders the sign in violation of the Zoning Resolution. The ordinance requires the Commissioner to prescribe rules to notify DOB of copy change. *See id.* §§ 26–253 to 26–255. Intro 809–A imposes civil penalties of up to $15,000 for the first violation, and $25,000 for the second violation. Each day a sign is maintained without a permit is a separate violation. *Id.* at § 26–256. The complaint challenges these enhanced civil penalties as excessive under the Eighth Amendment. Plaintiff also claims that the imposition of these penalties without a *scienter* requirement violates the First and Fourteenth Amendments.[6]

### E. PLAINTIFF'S OPERATIONS

Plaintiff is North America's largest outdoor advertising company and owns numerous sign structures in New York City. Plaintiff's clients include both non-commercial and commercial entities. Its clients place accessory signs, off-site advertising signs, and non-commercial signs on plaintiff's sign structures. The copy on a particular sign structure may vary, so a sign structure that contains an advertising sign one month may contain a non-commercial sign the next month. Sometimes plaintiff is compensated for non-commercial signs; other times it displays a non-commercial message free of charge as a public service.

Plaintiff owns 42 sign structures near a highway or park that it claims are adversely affected by the Zoning Resolution, *i.e.*, it owns 42 such signs in addition to signs that have been grandfathered. Of those 42 signs, only one contained non-commercial copy in July 2000. In April 2001, 13 of these 42 signs were blank and seven contained non-commercial copy. Plaintiff reported income for only two of the seven signs that contained non-commercial copy. Plaintiff cannot produce permits for eight of these sign structures.

### II. ANALYSIS

Plaintiff brings this action as a facial challenge to certain sections of the Zoning Resolution. Therefore, it must establish that no set of circumstances exists under which those sections would be constitutional. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Deshawn E. v. Safir*, 156 F.3d 340,

---

**6.** Also, in order to clarify that outdoor advertising companies are liable for violations of the Zoning Resolution and to facilitate the identification of entities responsible for a particular sign, Intro. 809–A requires all outdoor advertising companies to register with the City, provide information about signs under their control, and display their name and registration number on all signs under their control. Any outdoor advertising company that erects or alters a sign without registration shall be subject to the same civil penalties as individuals, as well as criminal penalties, for signs maintained in violation of the Zoning Resolution. If an outdoor advertising company is liable for civil penalties, it shall not receive City franchises or concessions for five years, and, if it is repeatedly found liable for civil penalties, or if it fails to pay penalties, the City may, after notice and a hearing, revoke or refuse to renew a company's registration. Intro. 809–A §§ 26–260 to 26–262. Finally, the Commissioner of the DOB may bring a special nuisance abatement action before the Office of Administrative Trials and Hearings to compel removal of an illegal sign, or authorize DOB to remove the sign if the outdoor advertising company does not comply with the order. *Id.* at § 26–127.3. These provisions are not challenged here.

347 (2d Cir.1998). Government enactments "are presumed constitutional." *Bush v. Vera*, 517 U.S. 952, 992, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). For the reasons set forth below, plaintiff has not shown that any of the challenged sections is unconstitutional on its face.

## A. FIRST AMENDMENT CLAIM

The City's zoning scheme permits "accessory use," *i.e.*, on-site commercial, signs near highways and parks and, so that non-commercial signs are not disadvantaged, permits non-commercial signs in those areas. This is in keeping with the City's allowance of non-commercial signs anywhere that commercial signs are allowed. The City excludes "advertising signs," *i.e.*, off-site commercial signs, that have not been grandfathered near highways and parks. The heart of plaintiff's argument is that the City cannot, consistent with the First Amendment, restrict off-site commercial signs near highways and parks while permitting non-commercial signs in those areas.

Undisputedly, there is no effort in the Zoning Resolution to censor ideas or target certain messages. Rather, the distinction between commercial and non-commercial speech is a distinction crafted and continuously applied by the United States Supreme Court. Indeed, in *Metromedia v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), described above at page 6, the Supreme Court expressly dealt with the subject of commercial billboards and recognized that they could be regulated in ways in which non-commercial signs could not. Thus, the distinction the City draws cannot be viewed as suspect, as plaintiff suggests it should.

The Court in *Metromedia* also expressly recognized that the traffic safety and aesthetic concerns justifying a bar on commercial signs would not necessarily justify a ban on non-commercial signs. *See* 453 U.S. at 503–15, 101 S.Ct. 2882. That was because San Diego allowed some commercial signs, namely on-site signs, which meant that the non-commercial signs were being treated less favorably. Here, the City's scheme tracks the requirements of *Metromedia*. It allows on-site accessory signs and non-commercial off-site signs, while restricting commercial off-site signs, and it does so for well-established, undisputed traffic safety and aesthetic concerns that the Supreme Court found sufficient in *Metromedia*.

■ The Supreme Court recently summarized the history of commercial speech in *Lorillard Tobacco Co. v. Reilly*, —— U.S. ——, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).

> For over 25 years, the Court has recognized that commercial speech does not fall outside the purview of the First Amendment. *See, e.g., Virginia Bd. of Pharmacy* [*v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)]. Instead, the Court has afforded commercial speech a measure of First Amendment protection "commensurate" with its position in relation to other constitutionally guaranteed expression. *See, e.g., Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 ...(quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 ...(1989)).

*Id.* at 2421. In recognition of the distinction between commercial speech and other speech, traditionally protected by the First Amendment, the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341

(1980), established a four-step test for regulation of commercial speech, under which:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2421 (quoting *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343).

The third step of *Central Hudson* requires that a "speech restriction directly and materially advance the asserted governmental interest." *Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2422 (quoting *Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999)). This requires more than mere speculation or conjecture; the governmental body must show that the asserted harm is real and that the regulation will in fact alleviate the harm to a material degree. *Id.* Nevertheless, the Supreme Court does not require "empirical data ... accompanied by a surfeit of background information ... We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense' " *Id.* (quoting

*Florida Bar,* 515 U.S. at 628, 115 S.Ct. 2371). The fourth step requires a "reasonable fit" between the governmental body's ends and the means chosen to accomplish those ends, a means no more extensive than necessary to achieve the desired objectives. This does not require that the means chosen be the least restrictive means. *Id.*

The Supreme Court in *Lorillard Tobacco* expressly rejected the attempt of the advertiser plaintiffs to eliminate the *Central Hudson* test and to treat regulations involving truthful commercial speech the same as regulations involving non-commercial speech. Rather, the Supreme Court continued to emphasize the reasonableness of the fit between the means and the ends and continued to reject a least restrictive means test. *See Lorillard Tobacco* at 2421–22.[7]

The application of *Central Hudson* in this case is governed by *Metromedia,* where the Supreme Court found unconstitutional a sign regulation that permitted on-site signs but prohibited all off-site signs because this prohibition included non-commercial signs. With respect to the distinction between on-site and off-site commercial advertising, the Court said, "[a]s we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Metromedia,* 453 U.S. at 512, 101 S.Ct. 2882.

---

**7.** This case differs from *Lorillard Tobacco* because the regulation at issue in this case governs all advertisements in order to achieve a goal unrelated to the content of the advertisements, while the regulation at issue in *Loril-* *lard Tobacco* targeted a particular type of advertisement in order to achieve a goal related to the content of that type of advertisement.

In contrast, the Court found that, "[i]nsofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; ·the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Metromedia*, 453 U.S. at 513, 101 S.Ct. 2882. As the court noted, "our recent commercial speech cases have consistently accorded noncommercial speech a greater degree of protection than commercial speech," and San Diego has "effectively invert[ed] this judgment." *Id.* The plurality opinion, in discussing the remand of the case, noted that "[s]ince our judgment is based essentially on the inclusion of noncommercial speech within the prohibitions of the ordinance, the California courts may sustain the ordinance by limiting its reach to commercial speech, assuming the ordinance is susceptible to this treatment." *Id.* at 521–22 n. 25, 101 S.Ct. 2882.

Following *Metromedia*, numerous courts have upheld sign regulations similar to the one challenged here. *E.g. Lavey v. City of Two Rivers*, 171 F.3d 1110 (7th Cir.1999); *Ackerley Communications of the Northwest, Inc. v. Krochalis*, 108 F.3d 1095 (9th Cir.1997); *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604 (9th Cir.1993); *National Advertising Co. v. City of Denver*, 912 F.2d 405 (10th Cir.1990); *Naegele Outdoor Advertising, Inc. v. City of Durham*, 844 F.2d 172 (4th Cir.1988); *Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 833 F.2d 43 (4th Cir.1987); *Major Media of the Southeast, Inc. v. City of Raleigh*, 792 F.2d 1269 (4th Cir.1986); *Outdoor Systems, Inc. v. City of Lenexa*, 67 F.Supp.2d 1231 (D.Kan.1999). For example, in *City of Denver*, the Court upheld an ordinance that banned off-site commercial billboards within 660 feet of highways, but allowed on-site commercial signs and non-commercial billboards within 660 feet because, under *Metromedia*, "the preference for non-commercial over commercial advertising under the new ordinance is the kind of underinclusiveness the First Amendment tolerates." 912 F.2d at 409. Similarly, in *City of Mesa*, 997 F.2d at 610 (9th Cir.1993), the Court upheld ordinances which allowed on-site signs, restricted off-site advertising signs to limited areas of the city, and allowed for the substitution of non-commercial messages for the copy on any permissible commercial sign.

■ In this case, as in *Metromedia*, there is no dispute as to the first two *Central Hudson* steps. There is no suggestion by the City on this facial challenge that the regulated commercial speech involves unlawful activity or is misleading, and there is no dispute by plaintiff as to the substantiality of the City's interest in regulating signs. The City's asserted interests are to improve traffic safety and the aesthetic quality of the City, while at the same time allowing businesses to identify their presence on a particular lot and allowing some off-site advertising signs, in a manner that is constitutional under *Metromedia. See Major Reports of the City Planning Commission* 85–90 (1940); *City Planning Commission Report* 2 (Feb. 18, 1998); *City Planning Commission Report* 2–8 (Dec. 13, 2000); Remarks by Mayor Rudolph W. Giuliani (March 19, 2001).

As the Supreme Court said, in finding that the San Diego ordinance in *Metromedia* had met step two of *Central Hudson*, there cannot "be substantial doubt that ... traffic safety and the appearance of the city ... are substantial governmental goals." *Metromedia*, 453 U.S. at 507–08, 101 S.Ct. 2882. Plaintiff acknowledges that the City has an outdoor signage problem. The opening paragraph of plaintiff's

reply brief concedes as much, stating that "[t]here are far too many billboards in the City; they are often far too close to each other; new billboards in unrestrained amounts appear by the day." Further, Timothy Stauning, President of the New York Outdoor Group, a group that includes plaintiff, acknowledged before the City Planning Commission that there was a proliferation of signs in the City, that the City had lost control over the administration and enforcement of its sign regulations, and that the City should attempt to curtail the proliferation of signs in the future. *See Hearing Before the City Planning Commission* 68–73 (Nov. 29, 2000). As *Lorillard Tobacco* expressly reaffirmed, "state interests in traffic safety and esthetics may justify zoning regulations for advertising," —— U.S. at ——, 121 S.Ct. at 2420 (citing *Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882).

Under the third step of *Central Hudson,* the City's regulations directly and materially advance the asserted governmental interests. First, as the Supreme Court found in *Metromedia,* the "accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety" is sufficient to satisfy the third step of *Central Hudson.* 453 U.S. at 509, 101 S.Ct. 2882. The Supreme Court also stated that it "is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Id.* at 510, 101 S.Ct. 2882. Second, the record in this case shows that the regulation directly and materially advances the government's interests. Since 1940, the City has repeatedly recognized that signs are distracting to drivers and that the uncontrolled spread of signs contributes to urban blight and threatens New York's attractiveness as a place to live and work. In particular, with the revitalization

of once industrial areas, the City has become especially concerned with the aesthetic harm that mega-signs are causing people who have decided to live and work in these redeveloped districts. *See City Planning Commission Report* 2–8, 30 (Dec. 13, 2000).

Turning to the fourth step of *Central Hudson,* there is a reasonable fit between the City's goals and the means chosen to accomplish them. The means are narrowly tailored to achieve the goals; indeed, as the Supreme Court stated, "the most direct and perhaps the only effective approach to solving the problems [signs] create is to prohibit them." *Metromedia,* 453 U.S. at 508, 101 S.Ct. 2882. The New York City Zoning Resolution is even more narrowly tailored than the San Diego ordinance at issue in *Metromedia* because, unlike that ordinance, which banned almost all off-site signs, the Zoning Resolution prohibits off-site commercial signs only where they cause the most aesthetic and traffic safety problems: near highways and parks, in residential neighborhoods, and in certain commercial districts. In fact, the Zoning Resolution stops short of completely prohibiting advertising signs near highways and parks. The City allows for advertising signs on grandfathered sign structures. The fit between New York City's goals and its means of achieving them is not undermined by the allowance of accessory, *i.e.,* on-site, signs near highways and parks because, as the Supreme Court held in *Metromedia,* "whether onsite advertising is permitted or not, the prohibition on offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising." *Id.* at 511, 101 S.Ct. 2882.

Plaintiff argues that the Zoning Resolution violates the third and fourth steps of

*Central Hudson* because it does not ensure that any sign structures will be removed. First, under step three, plaintiff argues that, if the sign structures are not removed, the Zoning Resolution will not in fact alleviate the stated harms to a material degree. Plaintiff's claim that it will not be economically beneficial to remove the sign structures and therefore it will not remove them is not sufficient to overcome the common-sense judgment of legislators that some sign structures will come down. *See Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2422. Plaintiff's evidence regarding costs may support the conclusion that, for some large sign structures, the costs of removing the structures may outweigh the costs of leaving the structures up (including taxes and maintenance costs). However, outdoor advertisers derive vastly more income from commercial advertisers than from non-commercial speakers. Only one of the 42 signs owned by plaintiff within 200 feet of a highway or public park contained non-commercial copy in July 2000, and of the seven such signs which contained non-commercial copy in April 2001, plaintiff reported income for only two. It is not mere speculation to conclude that reducing the potential income that signs can generate will reduce the present value of leaving sign structures up. And as the value of leaving sign structures up declines relative to the value of taking the sign structures down, more undoubtedly will be removed.

Also, while the City Planning Commission was concerned with sign structures in general, it focused on the new vinyl signs in particular. It concluded that these signs had fueled the recent proliferation of signs because, since they can be placed on the sides of buildings without the expense of massive sign structures, these new signs are inexpensive to post and to *remove. See City Planning Commission Report* 2–4 (Dec. 13, 2000).

In addition, the permitting scheme does not rely solely on economic forces to achieve the removal of signs and sign structures. Under Intro. 809–A, the City can compel removal, or authorize the DOB to remove, signs, or sign structures, or both, where permits cannot be produced; plaintiff alone cannot produce permits for eight of its 42 signs near highways or public parks. *See* Intro. 809–A § 26–127.3.

Moreover, even if the Zoning Resolution did not ensure the *removal* of any sign structures, plaintiff does not dispute that the Zoning Resolution will restrict the construction of sign structures in the *future.* Plaintiff ignores the dynamic nature of the problem confronting the City. The City is concerned not just with removing current sign structures, but it seeks also to combat the proliferation of signs in the future. It is undisputed that the bulk of sign structures contain advertising copy. Thus, prohibiting sign structures from containing advertising copy will reduce the construction of new sign structures because there will be less demand for new sign structures. That the Zoning Resolution directly and materially advances the governmental interest in combating the future growth of sign structures amply justifies the Zoning Resolution.

Under *Central Hudson* step four, plaintiff claimed at oral argument that the fact that existing sign structures will not necessarily come down indicates that the City did not "carefully calculate the costs and benefits associated with the burden on speech imposed" by the regulation. *Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2425 (quoting *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Plaintiff argued that the legislators did not consider the issue of whether restricting

signs would affect the number of structures. Indeed, plaintiff suggested that the legislators thought they were limiting structures when in fact they were limiting only sign copy.

The suggestion that the City Council was unaware of the effect of the laws it was passing defies the deference due to local legislators and is contradicted by the evidentiary record. The City recognized that regulating sign copy would reduce the proliferation of signs. The City had extensive evidence before it that the major cause of the proliferation of sign structures near arterial highways and parks was the widespread practice among outdoor advertising companies of obtaining permits under the false pretense of placing accessory use or non-commercial copy on sign structures and then illegally placing advertising copy on the structures. Had members of the outdoor advertising industry not subverted the operation of the Zoning Resolution by obtaining permits for accessory use and non-commercial signs and then illegally converting these signs into advertising signs, the restrictions on signs near highways and parks would have already reduced the number of sign structures in these areas. In a carefully calculated decision, the City concluded that closing the loophole that allowed for the construction of numerous sign structures, by enacting an enhanced permitting system and enlarged penalties, would slow the growth in the number of sign structures in the future.[8]

The record further shows that, through the years of regulation, the City has been concerned not only about reducing the sign problem, but also about not unduly interfering with the outdoor advertising industry's expectations in existing signs. For example, the City Planning Commission has recognized the need to allow growth in the outdoor advertising industry. *See City Planning Commission Report* 30 (Dec. 13, 2000). Commissioner Rose, Chairman of the City Planning Commission, indicated that the City has "been very careful for not banning legal signs, for not requiring the removal of existing legal signs that will become non-conforming signs." *Hearing Before the New York City Council Subcommittee on Zoning and Franchises* 39 (Jan. 9, 2001). Whether the purpose of this concern, represented in repeated grandfathering of signs, was to address industry concerns or to protect against potential lawsuits, *see id.* at 59, 63–71, or a combination of both, there can be no doubt that the legislature was aware of the multitude of issues involved in accomplishing the avowed goal of limiting large, obstructive signs.

█ Plaintiff also attempts to show that the fit between the City's goals and the means chosen to achieve them is not reasonable by proposing alternative regulations, such as regulations on the number of signs or the size of all signs, without regard to whether they are on-site, off-site commercial, or non-commercial. While the existence of numerous and obvious less

---

8. The record also establishes that the City was well aware of the distinction between a sign's copy and the structure on which it is located. For example, one owner of an outdoor advertising company, stated, "we want to make clear ... the sign is not illegal, and if anybody thinks the signs are going to go away they are mistaken. What's illegal is the use of the sign, not the structure. So if you interpret the law the way it's written, the law established that these signs could be built." In response, a City Planning Commissioner stated, "if advertising were no longer allowed, effectively one or two things would happen in my view. The sign would stand there abandoned, the structure would stand there, abandoned. Or someone might buy the building and therefore create an accessory use." *Hearing Before the City Planning Commission* 102–03, 118–19 (Nov. 29, 2000).

restrictive means is relevant to the reasonableness of the fit between a City's means and ends, *see Discovery Network,* 507 U.S. at 417 n. 13, 113 S.Ct. 1505 (1993), the City is not required to choose the least restrictive means. *See Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2422. Plaintiff fails to show that its proposed alternatives are less restrictive means than those in the Zoning Resolution, much less that they are numerous and obvious enough to call into question the fit between the City's means and ends.[9]

Finally, plaintiff, relying on *Discovery Network,* 507 U.S. at 410, 113 S.Ct. 1505, argues that, in complying with *Metromedia,* the Zoning Resolution's distinction between off-site commercial signs and off-site non-commercial signs is unconstitutional because both types of signs cause the same aesthetic and traffic safety harms.[10] As already noted, the Supreme Court in *Metromedia* expressly recognized that an ordinance that allows on-site signs and non-commercial signs while prohibiting off-site commercial signs would be constitutional. *See* 453 U.S. at 521 n. 26, 101 S.Ct. 2882.

In *Discovery Network,* Cincinnati, relying on an "outdated prohibition against the distribution of any commercial handbills" that was "enacted long before any concern about newsracks developed," banned all commercial newsracks in the city. 507 U.S. at 417, 113 S.Ct. 1505. The Supreme Court struck the ordinance, finding that there was not the reasonable fit required under *Central Hudson* between the City's asserted goals of aesthetics and safety and the ordinance's ban on commercial newsracks. It found that the ordinance had only a minimal impact on the overall number of newsracks on the City's sidewalks; therefore, the distinction between commercial newsracks and non-commercial newsracks bore no relationship whatsoever to the City's asserted interests. *See id.* at 418, 424, 113 S.Ct. 1505. Even then, the Supreme Court noted that "[o]ur holding, however, is narrow. As should be clear ... we do not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and non-commercial newsracks." *Id.* at 428, 113 S.Ct. 1505.[11]

---

**9.** The proposal to simply regulate the size of all signs near highways and parks would not address the City's concern with the proliferation of signs. The proposal to limit the number of signs might improve aesthetics and traffic safety but does not serve the City's goal of allowing accessory signs because the City has no control over the location and number of businesses that may wish to identify themselves, and, once the City allows accessory signs, the City must allow non-commercial signs to comply with *Metromedia.* Moreover, limiting the number of signs would create its own problems of City control over access to the limited number of signs.

**10.** While the City makes a modest effort to claim that commercial signs are more distracting in general, its factual support is limited, and the City admits that commercial and non-commercial signs that are identical in size, illumination, projection, and design cause the same traffic safety and aesthetic

harms. Further, for purposes of defendants' cross-motion for summary judgment, every reasonable inference from the evidence must be drawn in favor of plaintiff.

**11.** Infinity elevates the Supreme Court's concern in *Discovery Network* with the absence of a distinction between the effect of commercial advertising racks and the effect of newspaper racks to a new, separate principle of First Amendment law. However, the Supreme Court in *Lorillard Tobacco* declined to accept the invitation to create such a principle. *See Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2421. Therefore, the issue of the distinction or lack of distinction between the effects of commercial and non-commercial speech is more properly understood as informing the determination of the fit between the means and ends under *Central Hudson.* This is the use *Discovery Network* made of the distinction; and *Lorillard Tobacco* confirms that this

In this case, unlike *Discovery Network,* the fit between the asserted goals and the Zoning Resolution's means is reasonable because the Zoning Resolution has more than a minimal impact on the overall number of billboards. In *Discovery Network,* Cincinnati banned a "paltry" 62 commercial newsracks while leaving 1,500 to 2,000 non-commercial newsracks. 507 U.S. at 418, 113 S.Ct. 1505. Here, it is undisputed that the bulk of signs contain commercial copy. In *Destination Ventures, Ltd. v. Federal Communications Commission,* 46 F.3d 54, 56 (9th Cir.1995), the Court distinguished *Discovery Network* and found a reasonable fit between a regulation that bans unsolicited facsimile advertising and the goal of preventing cost shifting, despite the fact that the regulation allowed unsolicited non-advertising facsimiles because advertising facsimiles caused the bulk of the cost-shifting. The same reasoning applies here.

Unlike the ordinance in *Discovery Network,* the Zoning Resolution was designed to address the very harms caused by the medium being regulated. The City has been attempting to address the harms to traffic safety and aesthetics from signs, as well as the economic benefits derived from aesthetic improvements, for over 60 years. The City has also sought to allow, but regulate, on-site signs because of their unique role in identifying the location of a business. As the Court in *Discovery Network* recognized, the differing roles of onsite and off-site signs distinguishes the billboard context from the newsrack context. *See Discovery Network,* 507 U.S. at 424 n. 20, 113 S.Ct. 1505. "Each method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of

each method." *Metromedia,* 453 U.S. at 501, 101 S.Ct. 2882. In upholding an ordinance that allows on-site commercial and off-site non-commercial signs while prohibiting off-site commercial signs, after the decision in *Discovery Network,* the Court of Appeals for the Ninth Circuit in *City of Mesa* held that, "[a]pplying the *Central Hudson* test in the context of billboard regulations is not new for the Supreme Court or us. *Metromedia* remains the leading decision in the field, holding that a city, consistent with the *Central Hudson* test, may ban all offsite commercial signs, even if the city allows onsite commercial signs." 997 F.2d 604, 610 (9th Cir.1993); *see Krochalis,* 108 F.3d at 1099; *see also Marathon Outdoor v. Vesconti,* 107 F.Supp.2d 355, 366 (S.D.N.Y.2000).

It is clear from the history of the Zoning Resolution that the City's purpose is to allow on-site commercial signs while accommodating the requirements of *Metromedia.* Prior to 1998, the Zoning Resolution expressly allowed on-site advertising but prohibited most off-site advertising near highways and parks. After the New York Supreme Court in *Allied Outdoor* struck down this ordinance under *Metromedia* because it favored commercial over non-commercial speech, the City responded by amending the Zoning Resolution to "ensure that signs containing solely non-commercial speech will be treated in a uniform manner as signs relating to commercial uses or activities located on the zoning lot." *City Planning Commission Report* 5 (Feb. 18, 1998). Thus, it now allows non-commercial signs anywhere it allows on-site signs, including near highways and parks. While this attempt to equalize the treatment of on-site commercial speech and non-commercial speech

is the proper analysis. *See id.* at 2425 (citing *Discovery Network,* 507 U.S. at 417, 113 S.Ct. 1505).

pursuant to *Metromedia* has resulted in differential treatment between off-site commercial and non-commercial speech, this is a function of the on-site/off-site distinction that is unique to signs. New York City is justified in this differential treatment because of its interest in preserving on-site signs while satisfying *Metromedia*.[12]

In sum, unlike *Discovery Network*, this case does not raise the issue of whether a city may prohibit commercial speech totally while allowing non-commercial speech because the City allows both commercial and non-commercial signs. It merely restricts the type of commercial signs that may be displayed near parks and highways to on-site commercial signs, a restriction that *Metromedia* held is constitutional. Even near parks and highways, where the City's concerns for traffic safety and aesthetics are at their height, the City acknowledges the importance of commercial advertising for companies on their property. Having allowed unlimited numbers of this type of commercial advertising, the City has recognized that, under *Metromedia*, it has to treat non-commercial signs at least as well as commercial signs by allowing

non-commercial signs near highways and parks. As the Supreme Court held in *Metromedia*, "[i]nsofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages . . . ." *Metromedia*, 453 U.S. at 513, 101 S.Ct. 2882. Therefore, the Zoning Resolution satisfies the constitutional requirements for sign regulations, as established by the Supreme Court.[13]

## B. EQUAL PROTECTION

■ Plaintiff claims that the Zoning Resolution violates the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment because, by allowing civic, philanthropic, educational and religious groups to display a "flag, pennant, or insignia" in any district without restriction, the Zoning Resolution gives preferential treatment to some non-commercial speech over other non-commercial speech.

The challenged exception arises directly from land use determinations expressed in the zoning laws. The Zoning Resolution permits community facilities in all residen-

---

12. Merely allowing on-site non-commercial speech would have been insufficient to meet the constitutional requirements of at least equal treatment for non-commercial speech. The concept of "site" for non-commercial speech is itself problematic. *See, e.g., City of Mesa*, 997 F.2d at 614. One court has suggested non-commercial speech may be "on-site" "wherever the speaker is located." *Southlake Property Associates v. City of Morrow*, 112 F.3d 1114, 1118 (11th Cir.1997). If, on the other hand, non-commercial speech were limited to the site of organizations, so that, for example, such core First Amendment speech as contained on political signs would be disallowed if not attached to the zoning lot of a political clubhouse, then the fundamental principle that the government not favor some types of non-commercial speech over others would be violated. *See, e.g. id.; Ackerley Communications of Massachusetts, Inc. v. City of Cambridge*, 88 F.3d 33 (1st Cir.1996); *Na-*

*tional Advertising Co. v. City of Orange*, 861 F.2d 246 (9th Cir.1988).

13. For the same reasons, plaintiff's claim that the Zoning Resolution impermissibly favors commercial speech over non-commercial speech beyond 200 feet of a highway or public park also fails. Plaintiff is correct that the Zoning Resolution allows non-commercial signs to be larger than advertising signs beyond 200 feet of a highway or public park. However, as with signs within 200 feet of a highway or public park, plaintiff is drawing the wrong comparison. As discussed above, in attempting to comply with *Metromedia* while still allowing accessory signs, the City has equalized the treatment of accessory signs and non-commercial signs, by subjecting both types of signs to the same size limitation beyond 200 feet of a highway or public park.

tial districts, as well as some commercial and manufacturing districts. Zoning Resolution §§ 22–332, 32–62, and 42–52, merely allow these facilities, which include, for example, universities and museums, to display banners in these districts without complying with the size limitations on other signs. *See* ZR §§ 22–13, 22–14 (2001). In the absence of any evidence that this minimal exception has been allowed for a discriminatory purpose or that the Zoning Resolution has functioned in a discriminatory fashion, there is no sound reason, on this facial challenge, to find a constitutional violation. When similarly faced with a city ordinance which exempted signs placed by civic, philanthropic, educational, and religious organizations on their lots from regulations applied to other non-commercial signs, the Court of Appeals for the Seventh Circuit upheld the exemption because the Court did not read Supreme Court precedent "as requiring a local legislature to make a voluminous record in order to justify such common-sense exceptions." *Lavey*, 171 F.3d at 1116.

Unlike in *National Advertising Co. v. Town of Niagara*, 942 F.2d 145 (2d Cir. 1991), relied upon by plaintiff, the Zoning Resolution is not determining the subject matter of public debate. As discussed above, a City may not pick and choose among various types of non-commercial speech based on its content because "[t]o allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Metromedia*,

453 U.S. at 515, 101 S.Ct. 2882. In contrast to the ordinance in *Town of Niagara*, which limited the subject matter of all non-commercial signs to "temporary signs promoting events sponsored by" certain groups, the Zoning Resolution provisions challenged here do not on their face restrict the subject matter of public debate. 942 F.2d at 147.

Plaintiff also challenges OPPN # 10/99 on Equal Protection grounds; it claims that signs of civic, philanthropic, educational and religious organizations are exempted from the definition of advertising sign, even when these groups place signs that advertise goods or services. This claim is based on an erroneous reading of the City's regulations. OPPN # 10/99 does not exempt signs placed by these groups from the definition of advertising signs; it merely contains a presumption that, when these non-commercial groups place a sign, that sign is non-advertising. *See* OPPN # 10/99 § II.[14]

## C. VAGUENESS

Plaintiff claims that the line between commercial and non-commercial speech in the City's regulations is unconstitutionally vague. To begin with, the danger that the vagueness doctrine is designed to prevent is not implicated by the City's regulations. No penalty is imposed for mistakenly posting a commercial sign where only non-commercial signs are allowed, for no sign can be posted near a highway or park in the absence of a permit. Thus, there is no

---

**14.** Plaintiff argues that any reference to the nature of the speaker as either commercial or non-commercial violates the principle that First Amendment rights do not depend on who is speaking. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 784, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (core non-commercial speech that is otherwise protected by the First Amendment does not lose its protection merely because the source of the speech

is a corporation). But whether a sign is posted by a commercial or non-commercial entity may have an impact on whether the sign's copy is commercial or non-commercial. Thus, the principle of *Bellotti* does not bar the City from considering the commercial or non-commercial nature of the speaker in determining whether a sign is commercial or non-commercial.

risk of a chill of First Amendment rights from the distinction made between commercial and non-commercial speech. *See Grayned v. Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Children of the Rosary v. Phoenix,* 154 F.3d 972, 983 (9th Cir.1998).

■ More importantly, plaintiff cannot complain of the line between commercial speech and non-commercial speech because that is a line that the Supreme Court has repeatedly acknowledged, most recently in *Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2421. In support of its vagueness argument, plaintiff points to several examples of borderline cases as to whether a sign would be commercial or non-commercial. It suggests examples of a church advertising a bake sale; Shell Oil responding to a boycott advertisement by urging people to buy Shell Oil; and a magazine claiming that it is the only good thing the mayor has not taken credit for.[15] But plaintiff fails to identify any questionable rulings by the City since the permitting scheme went into effect in 1998.[16] "Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be correct, such an infrequent possibility should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area." *Children of the Rosary,* 154 F.3d at 983; *Major Media,* 792 F.2d at 1272–73; *see City of Denver,* 912 F.2d at 411.

Plaintiff also argues that it is not the absence of a definition, but the inconsistency in definitions between the Zoning Resolution and OPPN # 10/99, that renders the scheme vague. Plaintiff claims that the Zoning Resolution determines whether a sign is commercial or non-commercial based on whether the sign directs attention to a commodity, while OPPN # 10/99 makes the determination based on the identity of the speaker. This argument is based on a mischaracterization of OPPN # 10/99. In an attempt to assure protection of non-commercial speech, OPPN # 10/99 contains a presumption that non-commercial speakers engage in non-commercial speech, but, ultimately, OPPN

---

**15.** Plaintiff cites a document entitled "180 Examples of Advertising Signs in Commercial and Residential Zones in Manhattan." Included in the examples provided by this document are a "Work for Census 2000" sign, a Planned Parenthood sign, and a sign urging registration for the next election. Plaintiff erroneously states that these are examples the City considers to be advertising signs. This document was not prepared by the City; it was prepared by an outside company to highlight what it considered to be violations of the Zoning Resolution. Thus, it does not represent the City's views as to what is commercial and what is non-commercial.

**16.** Plaintiff's claim that the City improperly characterized a sign reading "Call 1–212–COP–SHOT. $10,000 for the Arrest and Conviction of Anyone Shooting a N.Y.C. Police Officer," as an advertising sign in *Allied Outdoor* is immaterial because the City made that determination prior to the 1998 amendments.

Plaintiff is correct that the City argued in *Allied Outdoor* that this sign was an "advertising sign." *See Allied Outdoor,* 172 Misc.2d at 711, 659 N.Y.S.2d 390. However, at that time, the Zoning Resolution made no provision for non-commercial signs, so the only two possible categories into which the City could place this sign were the advertising or accessory sign categories. It was because of this failure to provide for non-commercial signs that *Allied Outdoor* enjoined the enforcement of certain provisions of the Zoning Resolution. Nothing from the City's categorization of this sign as an advertising sign, when the category of non-commercial signs did not exist, suggests that the City would not treat such a sign as non-commercial now. In fact, Robert Iulo, who is the Director of Special Projects for the DOB and is responsible for enforcement of the sign regulations, has testified that he considers this sign to be non-commercial. *See* Iulo Deposition p. 107.

# 10/99 directs that the determination be made in accordance with the standard contained in the Zoning Resolution. *See* OPPN # 10/99 § II.

Nor is the testimony of Mr. Iulo inconsistent with this definition. Plaintiff asked Mr. Iulo whether several signs would be advertising or non-commercial signs. These included signs that read "Chabad Telethon," "Just born, 7,001,023 pounds, 8 ounces, The new Women and Children's Pavilion at New York Hospital Queens," "www.wuzupgod.com," "Revlon Run/Walk for Women," and "New York Magazine urges you to vote for Rudy Giuliani." In response, Mr. Iulo indicated that he would need more information, but his initial impression was that, if the speaker were a non-commercial speaker, the sign would be non-commercial. For example, he stated that the New York Hospital example probably would be non-commercial if New York Hospital were a non-profit hospital. If the speaker were a commercial speaker, Mr. Iulo would make a preliminary determination whether the sign directed attention to a commodity. For example, he stated that the Revlon sign and the vote for Giuliani sign were non-commercial. *See* Iulo Deposition pp. 99–112. These answers are consistent with the presumption that messages by non-commercial speakers are non-commercial, but that ultimately the issue of what is commercial turns on whether the sign directs attention to a commodity.

In sum, the City's sign regulations are not unconstitutionally vague because they draw a line repeatedly recognized by the Supreme Court. Nor are the regulations internally inconsistent because, while OPPN # 10/99 contains a presumption that non-commercial speakers engage in non-commercial speech, it ultimately directs that the determination be made in accordance with the standard contained in the Zoning Resolution.

## D.  PRIOR RESTRAINT

Insofar as plaintiff posts some non-commercial signs, it argues that the permitting system is an unconstitutional prior restraint on such signs. To begin with, the permitting scheme in OPPN # 10/99 is subject to prior restraint analysis because it conditions the exercise of expressive activity on official permission in the form of a permit from DOB officials.[17] *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 554, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *MacDonald v. Safir,* 206 F.3d 183, 194 (2d Cir.2000); *Beal v. Stern,* 184 F.3d 117, 124 (2d Cir.1999). As discussed below at pages 40 to 41, the City's permit system is not intended to be a censorship scheme, and there is no evidence that the City has ever used the permit system to favor one viewpoint over another. Nor is there any evidence that the scheme is intended to, or has been used to, bar non-commercial speech under the pretense that it is commercial. Nonetheless, since the permit system requires the DOB Commissioner to determine whether a sign near a highway or park is a permissible accessory or non-commercial sign, or an impermissible advertising sign, there remains the potential that the DOB could erroneously deny a permit to a non-commercial sign. For that reason, prior restraint analysis is applicable. *See Discovery Network,* 507 U.S. at 423 n. 19, 113 S.Ct. 1505; *New York Magazine v. Metro-*

---

17.  Although plaintiff includes in its complaint a challenge to the new maintenance permit scheme under Intro. 809–A, as well as to the permitting system under OPPN # ¹⁰⁄99, it is not here pursuing a challenge to the maintenance permits because the regulations governing them have not yet been issued.

*politan Transportation Authority,* 136 F.3d 123, 131–32 (2d Cir.1998).[18]

■ A system of prior restraint comes to this court with a heavy presumption against its constitutional validity because:

> a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. 1239. However, labeling the permitting system as a prior restraint does not end the inquiry because prior restraints are not unconstitutional *per se. See id.* at 558, 95 S.Ct. 1239. A system of prior restraint is not unconstitutional if it sufficiently limits the discretion of the licensing authority and provides procedural protections against misapplication. *See id.* at 559, 95 S.Ct. 1239; *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). As will be seen, OPPN # 10/99 avoids the dangers of prior restraints because Supreme Court precedent provides standards to guide permitting officials in distinguishing commercial from non-commercial speech, the permit scheme is not a censorship scheme, and applicants receive the procedural protections required for non-censorship licensing schemes.

■ **1. Scope of Discretion:** Under OPPN # 10/99, DOB officials will issue a permit to an applicant who wishes to display a sign near a highway or park if the applicant demonstrates that the proposed sign is either an accessory sign, *i.e.,* an on-site sign, or a non-commercial sign rather than an advertising sign. *See* OPPN # 10/99 § I. The definition of "advertising sign" under the Zoning Resolution is virtually identical to the definitions of commercial signs upheld in other billboard cases. *See, e.g., Metromedia,* 453 U.S. at 494, 101 S.Ct. 2882, *City of Denver,* 912 F.2d at 408.[19] That the Zoning Resolution does not define non-commercial speech explicitly is immaterial. *See City of Denver,* 912 F.2d at 410 (upholding an ordinance that defines advertising signs, but not non-commercial signs, as not granting unfettered discretion); *Major Media,* 792 F.2d at 1272. To determine whether a sign is a non-commercial or an advertising sign, OPPN # 10/99 refers to the definition section of the Zoning Resolution, but contains

---

**18.** The City, citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) and *Hickerson v. New York,* 146 F.3d 99 (2d Cir.1998), argues that prior restraint analysis should not be applied. However, neither case addresses the issue of an executive's power to license speech prior to its occurrence. Courts of Appeals of other Circuits have applied prior restraint analysis to sign permitting schemes where an executive must determine whether speech is commercial or non-commercial. *See City of Mesa,* 997 F.2d at 613 (applying prior restraint analysis, and upholding a sign regulation similar to the one at issue in this case as not granting unfettered discretion to government officials); *City of Denver,* 912 F.2d at 410 (same).

**19.** Under the Zoning Resolution, an advertising sign is a sign that "directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same zoning lot and is not accessory to the use located on the zoning lot." ZR § 12–10 (2001). In *Metromedia,* San Diego defined an advertising sign as a sign that "directs attention to a product, service or activity, event, person, institution or business." 453 U.S. at 494, 101 S.Ct. 2882. In *City of Denver,* Denver defined a commercial sign as a "sign which directs attention to a business, commodity, service, entertainment or attraction sold, offered or existing elsewhere than upon the same zoning lot where such sign is displayed." 912 F.2d at 408.

a presumption that signs containing copy from governmental, charitable, religious, civic, philanthropic, and/or educational organizations are non-commercial. *See* OPPN # 10/99 § II.

Plaintiff argues that OPPN # 10/99 vests unfettered discretion in DOB officials because the line between commercial and non-commercial speech is not "narrow, objective, and definite," as required by *Shuttlesworth*, 394 U.S. at 151, 89 S.Ct. 935. In *Shuttlesworth*, the Supreme Court reversed the conviction of a petitioner under an ordinance which allowed Birmingham to prohibit any parades or demonstrations that were inconsistent with "public welfare, peace, safety, health, decency, good order, morals or convenience." *Id.* at 149, 89 S.Ct. 935. In contrast, the standard guiding DOB officials in this case has no reference to viewpoint and is one that has been developed by the Supreme Court for over 25 years. The Supreme Court has consistently defined commercial speech as speech that proposes a commercial transaction. *See, e.g., Lorillard Tobacco,* —— U.S. at ——, 121 S.Ct. at 2421; *Fox,* 492 U.S. at 473–74, 109 S.Ct. 3028; *Virginia State Bd. of Pharmacy,* 425 U.S. at 761–62, 96 S.Ct. 1817.

> Because our First Amendment jurisprudence recognizes a distinction between commercial and noncommercial speech, government officials have to place a particular message into one or the other category for purposes of regulation. The potential difficulty of that categorization in itself does not render the regulations unconstitutional.... [T]he city officials can and must rely on judicial precedent to determine what is commercial speech.... If the Supreme Court's definitions of commercial and noncommercial speech do not constitute "narrow, objective and definite standards," it is hard to imagine what would.

*City of Mesa,* 997 F.2d at 613 (citation omitted). As with plaintiff's vagueness claim, the occasional difficult case does not justify striking down the entire ordinance on a facial challenge. This is particularly so where the distinction is one that the Supreme Court not only allows, but indeed requires, if a City is to permit accessory signs. *See id.; City of Denver,* 912 F.2d at 410–11.

In support of its argument that OPPN # 10/99 vests unbridled discretion in the DOB, plaintiff relies on the statement in *New York Magazine v. Metropolitan Transportation Authority,* that "where there are both commercial and political elements present in speech, even the determination whether speech is commercial or not may be fraught with ambiguity and should not be vested in an agency such as the [Metropolitan Transportation Authority ('MTA') ]." 136 F.3d at 131. In the *New York Magazine* case, the Court of Appeals for the Second Circuit invalidated the MTA's removal of signs from city buses that featured the New York Magazine logo and stated: "possibly the only good thing in New York Rudy hasn't taken credit for." *Id.* at 125. Nothing in that case suggests that the Court was rejecting the traditional distinction between commercial and non-commercial speech. Rather, it rejected the MTA's claim that, because the advertisement was essentially commercial, it could regulate the advertisement under New York Civil Rights Law § 50, which prohibits the use of a person's name in an advertisement without his consent. Whether commercial or non-commercial, said the Court, § 50 could not be used by the MTA as a prior restraint because it was up to the individual and not the agency to seek enforcement of § 50 in the courts. Also significant, and in marked contrast to this case, there was evidence that the MTA was targeting the political element of this particular advertisement;

the removal of the signs followed a telephone call from Mayor Giuliani's office asking that they be removed. *See id.* at 131–32.

**2. Procedural Protections:** Two procedural requirements apply to all prior restraints on First Amendment expressive activity: 1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; and 2) expeditious judicial review of the restraint must be available. Where there is evidence that censorship of viewpoint is involved, a third requirement arises, namely that the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion); *Freedman v. Maryland,* 380 U.S. 51, 57–60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *New York Magazine,* 136 F.3d at 131–32. The third step is not required where, as here, an official is not engaged in direct censorship of particular expressive material by "passing judgment on the content of any protected speech." *FW/PBS, Inc.,* 493 U.S. at 229, 110 S.Ct. 596. In determining whether the judgment of the official is improperly based on content, the principal inquiry is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (emphasis in original); *see Hill v. Colorado,* 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

In this case, the DOB is not engaged in censorship. The implementing regulations are justified without reference to the content of the regulated speech. Non-commercial signs, without regard to content, are allowed wherever commercial signs are allowed, and there is no evidence that the City has sought to deny non-commercial signs under the guise of finding the signs to be advertising. Plaintiff has not identified a single instance where the City has denied a permit for a non-commercial sign on the ground that it was not a non-commercial sign but an advertising sign. Indeed, the implementing regulations appear to give the broadest reach to non-commercial speech. As described above, in drawing the line between commercial and non-commercial speech, non-commercial speakers are presumed to engage in non-commercial speech, but commercial speakers are not presumed to engage in commercial speech; thus, a commercial speaker engaging in non-commercial political speech is considered non-commercial. *See* OPPN # 10/99 § II; Iulo Deposition pp. 103–04, 111–12.

I turn then to the two procedural requirements applicable here. The first is met because the DOB must act on an application within 40 days, or 60 days if there is good cause for an extension. *See* Administrative Code § 27–191. If denied a permit, an applicant may appeal the decision to the BSA, which must render a decision "expeditiously." *See* New York City Charter § 669(c) (2000). Thus, there is no risk that the official will indefinitely suppress permissible speech. *See FW/PBS, Inc.,* 493 U.S. at 227, 110 S.Ct. 596.

Plaintiff contends that the licensing scheme does not satisfy the specified brief period for agency action requirement because the scheme requires only that the BSA act "expeditiously." However, as the Court held in *Gasparo v. New York,* 16 F.Supp.2d 198, 210 (E.D.N.Y.1998), in upholding an ordinance that required a "prompt" decision on the appeal of a denial

of a license, "[a]lthough the term 'prompt' does not affix a precise duration to the time period in which a decision may be reviewed, courts are able to determine whether such a standard has been met in a particular case, and a statute's failure to specify precise durational requirements does not necessarily render it unconstitutional."

■ In addition, under New York law, if the BSA is not acting fast enough, an applicant may file a petition to compel agency determination. *See* C.P.L.R. § 7803. Or, an applicant can bypass the appeals process altogether and challenge the DOB decision in state court because New York law does not require exhaustion of administrative remedies to challenge the constitutionality of agency action. *See Watergate II Apartments v. Buffalo Sewer Authority*, 46 N.Y.2d 52, 57, 412 N.Y.S.2d 821, 385 N.E.2d 560 (1978); *Sikora v. Bd. of Education*, 51 A.D.2d 135, 138, 380 N.Y.S.2d 382 (4th Dept.1976). Given these protections for applicants, there is no risk that officials will indefinitely suppress protected speech.

Nor is the 40 to 60 day time limit for an initial DOB decision unreasonable. *Cf. Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141–42, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) (finding a 50 to 57 day time-limit for a movie censorship board to review a film unreasonable because of the chilling effect of this time period on free speech). Unlike the censor in *Teitel*, here the DOB must determine not only whether a sign's copy is commercial or non-commercial, but also whether a sign is accessory to the lot's use, and whether it complies with size and other technical requirements of the Zoning Resolution. *See TK's Video, Inc. v. Denton County*, 24 F.3d 705, 707 (5th Cir.1994) (upholding a licensing scheme for adult entertainment establishments that required action on license applications within 60 days); *Graff v. Chicago*, 9 F.3d 1309, 1324 n. 10 (7th Cir.1993) (upholding a licensing ordinance for newsstands that has a 65 day time limit for action, with an additional 35 day time limit for a hearing if an application is denied).

The implementing regulations also satisfy the requirement of expeditious judicial review. Plaintiff argues that there is no guarantee of expeditious judicial review because the ordinance itself does not provide for judicial review of permit denials. However, Article 78 of the New York C.P.L.R., the very purpose of which is to afford relief to parties aggrieved by governmental action, ensures that anyone improperly denied a permit will receive expeditious judicial review. *See Gasparo*, 16 F.Supp.2d at 211, *citing* N.Y.C.P.L.R. § 7801.

The Court of Appeals for the Second Circuit has not yet been presented with a record it considered sufficient to determine whether Article 78 proceedings are adequate to meet the expeditious judicial review requirement. *See MacDonald*, 206 F.3d at 194–95 (declining to reach the issue and remanding to the district court because of an insufficient factual record); *Beal*, 184 F.3d at 128–29. However, as Judge Allyne R. Ross analyzed the issue in her well-reasoned opinion in *Gasparo*, the heightened protection of an ordinance providing for prompt judicial review is not needed in this case. *See MacDonald*, 206 F.3d at 194 (referring to Judge Ross's "thorough analysis of the issues raised with respect to an Article 78 proceeding.") Since the City's billboard regulations do not involve a censor passing on the content of speech, heightened protection is unnecessary to combat the danger that is the rationale for requiring expeditious review, namely, the likelihood that a censor will be less sensitive to First Amendment concerns than to the fulfillment of the censor-

ship function and will discriminate against disfavored speech. Rather, the general provision for prompt judicial review embodied in Article 78 is sufficient to ensure that a city official does not suppress protected speech. *See Gasparo,* 16 F.Supp.2d at 212–13; *Graff,* 9 F.3d at 1331 (Flaum, J., concurring).

"[A]n Article 78 proceeding provides an unsuccessful applicant with a forum in which to make all constitutional challenges." *Gasparo,* 16 F.Supp.2d at 213; *see Cahill v. Public Service Commission,* 76 N.Y.2d 102, 107–09, 556 N.Y.S.2d 840, 556 N.E.2d 133 (1990); *Lucas v. Scully,* 71 N.Y.2d 399, 403, 526 N.Y.S.2d 927, 521 N.E.2d 1070 (1988); *Zorach v. Clauson,* 303 N.Y. 161, 100 N.E.2d 463 (1951). Where a constitutional challenge is made, the Article 78 court does not apply an arbitrary and capricious standard, as plaintiff argues, but determines whether there has been a constitutional error. *See Kovarsky v. Housing Development Admin. of New York,* 31 N.Y.2d 184, 335 N.Y.S.2d 383, 286 N.E.2d 882 (1972). This access to judicial review is prompt because, as noted above, unlike other challenges to administrative action, a petitioner who challenges the denial of an application as unconstitutional does not have to exhaust administrative remedies. *See Watergate II Apartments,* 46 N.Y.2d at 57, 412 N.Y.S.2d 821, 385 N.E.2d 560; *Sikora,* 51 A.D.2d at 138, 380 N.Y.S.2d 382.

Plaintiff argues that Article 78 proceedings do not satisfy *Freedman* because Article 78 does not ensure prompt judicial determinations. However, the Court of Appeal for the Second Circuit has held that, in the non-censorship context, "prompt *access* to judicial review in state courts would satisfy *Freedman.*" *Beal,* 184 F.3d at 129 (emphasis added). But even if *Freedman* and *FW/PBS* required prompt judicial resolution of challenges to non-censorship agency action, Article 78 would satisfy this requirement. An aggrieved petitioner may obtain relief on an expedited basis by bringing an application for an order to show cause, *see* N.Y.C.P.L.R. § 7804; obtain a stay pending the resolution of the petition, *see id.* at § 7805; *Gasparo,* 16 F.Supp.2d at 213; or obtain a preliminary injunction pursuant to N.Y.C.P.L.R. § 6313 to preserve the *status quo* during the pendency of the Article 78 proceeding. *See Nassau Roofing & Sheet Metal Co., Inc. v. Facilities Development Corp.,* 70 A.D.2d 1021, 1021, 418 N.Y.S.2d 216 (3rd Dept.1979). Motions for provisional remedies must be decided within twenty days of submission. *See* N.Y.C.P.L.R. § 2219(a). Therefore, under Article 78, a petitioner may obtain prompt relief.[20]

### E. CIVIL PENALTIES

■ Plaintiff argues that Intro. 809-A's imposition of civil penalties without a *scienter* requirement violates the First and Fourteenth Amendments, but acknowledges that existing law is to the contrary. While the Supreme Court has held that imposing criminal penalties on a bookseller

---

**20.** Plaintiff cites three cases which it claims demonstrate a lack of prompt judicial determination, *Sievers v. New York,* 182 A.D.2d 580, 582 N.Y.S.2d 722 (1st Dept.1992); *Lewis v. Vesconti,* Index No. 47542/99 (Sup.Ct. Kings Co., Feb. 24, 1999); and *Mazza & Avena, Inc. v. Chin,* 261 A.D.2d 546, 687 N.Y.S.2d 909 (2d Dept.1999). However, in all three of these cases, the petitioner was challenging the classification of a sign as an advertising sign as opposed to an accessory sign. None of these cases challenged agency action as unconstitutionally classifying non-commercial copy as commercial copy, and thus *Freedman* and *FW/PBS* were not implicated by these decisions. There is nothing in these cases to suggest that, when faced with a First Amendment claim, New York courts will not act promptly.

for selling obscene materials without a *scienter* requirement is unconstitutional, *see Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), imposing civil penalties upon outdoor advertisers for the content of their billboards without *scienter* is constitutional because, unlike a bookseller, who cannot possibly read all the material it sells, an outdoor advertiser has the means to inform itself of the content of its signs. *Lavey,* 171 F.3d at 1117. Indeed, in this case, where the penalty arises from the display of a sign without a permit, outdoor advertisers will know whether or not they are in violation of the ordinance because they will know whether or not they have a permit.

## F. EXCESSIVE FINES

"Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Cheffer v. Reno,* 55 F.3d 1517, 1523 (11th Cir.1995); *see Kraebel v. Michetti,* 1994 WL 455468 *11 (S.D.N.Y.1994). In this case, no fine has been imposed, and no enforcement proceedings have been commenced against plaintiff. Plaintiff concedes that its excessive fines claim therefore is not ripe, and thus defendants' motion for summary judgment on this claim will be granted.

## CONCLUSION

For the above stated reasons, plaintiff's motion for summary judgment on the first five claims is denied, and defendants' motion for summary judgment on all six of plaintiff's claims is granted. Plaintiff's motion to strike the affidavit of Meg Maguire, President of Scenic America, is also denied. The affidavit was not improper and, in any event, the court did not rely on the affidavit.

The Clerk of Court is directed to enter judgment for the defendants.

**SO ORDERED.**