**NICHOLS MEDIA GROUP, LLC, Plaintiff,**

v.

**THE TOWN OF BABYLON, Defendant.**

**Nichols Media Group, LLC, Plaintiff,**

v.

**The Town of Islip Defendant.**

**Nos. CV 02-2332, CV 02–2334.**

United States District Court, E.D. New York.

April 14, 2005.

Wilder & Linneball, LLP, Buffalo, NY, by J. Joseph Wilder, Christopher S. Nickson, for Plaintiff.

Law Offices of Mark A. Cuthbertson, LLP, Huntington, NY, by Mark A. Cuthbertson, for Town of Babylon.

Vincent J. Messina, Jr., Islip Town Attorney, Richard Hoffman, Assistant Town Attorney, Islip, NY, for Town of Islip.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

Plaintiff, Nichols Media Group, LLC ("Nichols" or "Plaintiff") commenced these actions challenging the constitutionality of the sign ordinances of the towns of Babylon and Islip, New York. The cases were tried together before the court on January 3 and 4, 2005. Having reviewed and considered the parties' post-trial submissions, this constitutes the court's Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

A. *The Parties*

1. Nichols Media ("Nichols" or "Plaintiff") is a New York corporation that is engaged in the outdoor sign and advertising business.

2. Plaintiff's business involves locating and leasing sites for the erection of billboard advertising. Nichols negotiates ground leases, easements or purchases of property for this purpose. Once Nichols has obtained the right to use real property, it erects billboards on that property.

3. Billboards erected by Nichols fall generally into three size categories. Those categories are billboards that are known as "bulletins" which are 13 by 48 feet, "poster panels" which are 12 by 25 feet and "eight sheets" which are 6 by 12 feet in size. Usually such billboards bear advertising messages on both sides. While it is possible that the billboards erected might advertise for services available on the premises where the billboard is located, it is agreed that the billboards sought to be erected by Nichols in this matter would include those that advertise for products and services not available on the site where the billboard would be located.

4. Billboards erected by Nichols include those conveying purely commercial messages as well as those devoted to non-commercial speech on matters of public importance.

5. The Town of Babylon ("Babylon") is located in Suffolk County, New York. Babylon has enacted a comprehensive local ordinance, the provisions of which are detailed below, governing the erection of signs within the town (the "Babylon Ordinance").

6. The Town of Islip ("Islip") is located in Suffolk County, New York. Islip has enacted a comprehensive local ordinance, the provisions of which are detailed below, governing the erection of signs within the town (the "Islip Ordinance").

7. When referring to both Babylon and Islip herein the court will refer to defendants collectively as the "Towns." When referring to the ordinances of both Babylon and Islip, the court will refer collectively to the "Ordinances."

B. *The Babylon and Islip Ordinances*

1. *Babylon Ordinance*

8. The Babylon Ordinance contains a "Statement of Purpose" which sets

forth Babylon's reasons for passing legislation regarding, *inter alia,* the size and placement of signs. This statement appears in section 213–386 of the Babylon Ordinance and expresses the collective legislative judgment of its Town Board that the "quality of life" of Babylon residents "is substantially effected by the location, height, size, construction and general design" of signs. Signs existing "in harmony" with the community are stated to serve the purpose of "conveying information while not detracting from the public health, safety and welfare." On the other hand, signs that are "misplaced, disproportionate to the surrounding environment, in excessive proliferation or containing excessive lighting or other displaced fixtures," are stated to exist in "disharmony to the environment of the town and constitute egregious examples of ugliness, distraction and deterioration . . . degrade the aesthetic quality of the environment; detract from the natural and scenic beauty, as well as the character and order" of the town. Further, such signs are stated to "cause diminution in property values and do provide visual distractions and obstruction to passing motorists which can cause or contribute to traffic accidents." Babylon Code Art. XXXIII § 213–386.

9. To summarize, Babylon has identified the following factors as reasons for the regulation of signs within its borders: (1) aesthetics, (2) property values and (3) traffic safety.

10. The Babylon Ordinance contains a variety of provisions regarding the construction, design and placement of signs; the majority of which are not relevant here. Such provisions include, for example, a ban on the erection of signs that conflict with or can be mistaken for vehicular or traffic signals, and a provision prohibiting the placement of signs within the right-of-way of a public street.

11. Provisions of the Babylon Ordinance that were touched upon by trial testimony were general provisions regarding sign size, portability and illumination. Also the subject of trial testimony was: (1) the ban on signs advertising businesses or commercial interests that are not connected with the property upon which the sign is located; (2) the ban on portable signs; (3) the ban on obscene signs; (4) the exemption from regulation of governmental signs; (5) the allowance of non-commercial copy in lieu of otherwise authorized copy; (6) a provision regarding the placement of signs in a specific district known as the "Commercial Overlay District"; (6) permit fees and (7) a severability clause. Testimony regarding each of these issues is discussed further below.

12. The ban that the Babylon Ordinance places on signs advertising businesses or commercial interests not connected with the property where the sign is located appears in section 213–393 and states that no sign may be used to call attention to, or in any way advertise, any business, product or service that is neither performed on nor connected with the property or building on which the sign appears. This section operates as a ban on what is known as "off-site" advertising, *i.e.,* the advertising of products, information or services available at any

location other than where the sign is located.

13. The ban that the Babylon Ordinance places on portable signs appears in section 213–392 and states that portable signs standing on the ground or attached to trailers are prohibited. That section further states that a vehicle or trailer may not be used primarily as a sign or structural support for a sign.

14. The ban that the Babylon Ordinance places on obscene signs appears in section 213–394. That provision prohibits signs that are "in whole or in part, obscene or pornographic in character."

15. Section 213–387 of the Babylon Ordinance defines the term "governmental sign" as "any sign erected and maintained by or at the direction of any governmental body, organization, agency or corporation." The Babylon Ordinance's definition of regulated "signs" specifically exempts from its reach "governmental signs."

16. Section 213–415 of the Babylon Ordinance, added after earlier litigation involving a predecessor ordinance, allows for the substitution of non-commercial copy in lieu of otherwise authorized copy.

17. The permitting process, including fees and information to be submitted, appears in section 213–398 of the Babylon Ordinance. Permits are issued by the Town's Building Inspector who approves applications based upon the "structural safety" of the proposed sign which is to be in conformance with "recognized engineering standards."

18. Although Section 213–393 of the Babylon Ordinance bans off-site advertising, Article XXXIV of the Town Code ("Article 34") carves out a limited exception to this ban. This provision applies only to that area in Babylon known as the "Commercial Overlay District." This district was created in 2000 and creates specific zoning requirements for the character of this limited area. For example, there are specific heights allowed for office buildings, motels and hotels within this district. Those heights vary depending upon the proximity to certain roads, residential areas and cemeteries.

19. Relevant here is that part of Article 34 providing for off-premises advertising under certain circumstances. Section 213–418.14 of Article 34 states that off-premises advertising is to be allowed in the Commercial Overlay District by special exception that may be granted by the Babylon Town Board. Such an exception can be granted only if four conditions are met: (1) the proposed sign must be for a business, product or service located within the Commercial Overlay District; (2) the sign must be otherwise permitted by the Town's sign ordinance; (3) the proposed sign must create no increase in the allowable number or size of signs and (4) there is demonstrated a special need for the sign because the business the sign calls attention to is "isolated and/or not visible from a main thoroughfare, and because such location substantially and detrimentally affects the viability of that business." Babylon Town Code Art. XXXIV § 418.14(B).

20. Section 213–416 of the Babylon Ordinance is its severability clause

which states that if any portion of the ordinance is found to be in conflict with any law, that provision may be severed.

2. *Islip Ordinance*

21. The Islip Ordinance contains a statement of purpose similar to that of the Babylon Ordinance. Specifically, Section 68–394 of the Islip Ordinance states that the purpose of sign regulation in the town is to: (1) protect the safety of the public; (2) enhance the aesthetic environment of the town; (3) reduce motorist distraction; (4) provide for uniform design standards; (5) encourage excellence in sign design; (6) improve business identification and sign comprehension; (7) limit the use of energy in sign design and maintenance and (8) amortize and replace signs which do not conform to the provisions of the Ordinance.

22. The Islip Ordinance thus shares at least two express goals identified by Babylon, *i.e.*, traffic safety and aesthetics.

23. Like the Babylon Ordinance, the Islip Ordinance contains many provisions not at issue in this litigation. Those provisions that are at issue here are: (1) the single sign per parcel of land limitation; (2) the ban on off-site advertising; (3) a ban on "obscene" or "immoral" signs; (4) the allowance of noncommercial copy in lieu of otherwise authorized advertising copy; (5) permit fees and (6) a severability clause.

24. Section 68–397(A)(1) of the Islip Ordinance permits only a single ground sign on any parcel of land containing one or more buildings except for "public interest" signs. A public interest signs is defined as a sign "containing a cautionary message, such as 'beware of dog,' or 'no trespassing,' or an information message, such as 'exit' or parking." ' Thus, with the exception of these "public interest" signs, businesses are limited to a single sign identifying or advertising their goods or services.

25. The Islip Ordinance's ban on off-site advertising appears in section 68–396(G) which lists among those signs not permitted in Islip "commercial billboard which is rented or used to advertise a product, service or establishment which is not the principle product, service or establishment found on the property containing the billboard."

26. Islip's ban on "immoral" or "obscene" signs appears in section 68–396(K) of its ordinance which bans such signs as "determined by the Town Board."

27. Section 68–395 © provides that any sign permitted by the Islip Ordinance is allowed to contain "noncommercial copy in lieu of any other copy." Like the Babylon Ordinance, this was added to the Islip Ordinance following earlier litigation involving the constitutionality of a predecessor ordinance.

28. The permit and fee structure contained in the Islip Ordinance appears in Section 68–402. That section states that no sign may be erected, or the content of a sign changed, prior to payment of a permit fee. The sign permit fee is set at $1 per square foot. Trial testimony was minimal on this issue, but it did appear that Islip is cur-

rently collecting a permit fee of $2 per square foot.

29. Although the Islip Ordinance does not contain a governmental sign exemption, Nichols alleged that Islip's sign regulatory scheme is not applied to governmental entities. The court finds this allegation to be borne out and holds that the Islip Ordinance contains a *de facto* exemption for governmental signs.

30. The severability clause contained in section 68–403.1 of the Islip Ordinance states that "if any provision of [the ordinance] or the application thereof to any person or circumstance is held invalid, such invalidity shall not effect other provisions or applications of [the ordinance] which can be given effect without the invalid provisions or application, and to this end the provisions of [the ordinance] are severable".

C. *The Testimony*

31. As noted, the cases challenging both the Babylon and Islip Ordinances were tried together. Testifying for Plaintiff as to matters directed toward the Towns were Steve Nichols, the President of Nichols Media, Duane Monical, a civil engineer with experience designing sign structures and Dr. Suzanne Lee, an industrial and systems engineer. Testifying for the Plaintiff with respect to the Town of Babylon was John Ianni, an owner of land located in Babylon who intended to enter into a lease with Plaintiff that would allow Nichols to erect a billboard on that land. Also called to testify was Jerome Smith, a Babylon employee with knowledge of that town's ordinance. With respect to the Islip Ordinance, Plaintiff called Raymond Davila, Islip's Code Enforcement Officer.

32. Briefly stated, Steve Nichols testified regarding his experience in the outdoor advertising industry and his attempt to obtain permits for billboards to be erected along an area of road that runs through both Babylon and Islip known as Sunrise Highway. He also testified regarding his observations of several signs located within both towns and offered his opinion regarding the aesthetic impact of the billboards he proposed for Sunrise Highway. Ianni, a business owner, but not a resident of Babylon, testified as to his commercial interest in erecting a billboard on his property.

33. Monical and Lee were called as experts. Monical testified that the structures sought to be erected by Nichols were safe and met all applicable safety requirements. Lee testified regarding the impact of billboards on traffic safety. Finally, Smith and Davila were called to testify as to their knowledge of their respective town codes

34. In addition to cross-examination of the witnesses above by both Babylon and Islip, Babylon called as a witness Peter Casserly, the Babylon Commissioner of Planning and Development. Casserly testified regarding permit fees collected by Babylon.

D. *Sunrise Highway and the Proposed Billboards*

35. Sunrise Highway is a limited access road that runs through parts of both Babylon and Islip. At its widest point, Sunrise Highway has three lanes of traffic running in an

easterly direction and three lanes of traffic running in a westerly direction. There are both traffic lights and cross-streets located on parts of Sunrise Highway that run through the Towns. While businesses are located along the east and west service roads of Sunrise Highway, areas as close as 200 feet south and north of Sunrise Highway are residential areas comprised primarily of single family homes.

36. Received in evidence were digital photographs of sites along Sunrise Highway where Nichols proposed to erect billboards. Digitally superimposed on these photographs were examples of billboards of the same size proposed in Nichols applications. Thus, it was possible for the court and the witnesses to see how Sunrise Highway would appear once the proposed billboards were erected.

37. It was Nichols' purpose, through introduction of such digitally enhanced photographs, to show that the billboards it intended to erect would be similar to on-site signs already existing along Sunrise Highway and that the billboards would not change the landscape. For similar reasons, Nichols introduced photographs of signs located within the Towns that were less than pleasing to the eye. Certain of these signs were in obvious violation of the Towns' sign regulations and were noted to require action for removal.

38. The court's review of the digitally imposed billboards leads the court to conclude, as a matter of fact, that such billboards would materially change, for the negative, the view as one drives along Sunrise Highway. Billboards proposed by Nichols in the Towns would be in excess of 600 square feet. These billboards would be between twenty-five and forty-eight feet wide and would rise as high as fifty-five feet over the road. Significantly less of the sky would be visible as it would be blocked out by the large billboards. Indeed, when one views the digitally imposed billboards, it becomes clear that imposition of these billboards has nothing less than a jarring effect on the landscape.

39. The court further finds that while the Sunrise Highway area cannot be described as bucolic farmland, it is also not properly described as a purely commercial or urban area. Residential neighborhoods are within walking distance of Sunrise Highway and it can be viewed from houses located on both the north and south sides of this road. The nature of Sunrise Highway, however characterized, does not render the Towns any less able to show an interest in the preservation of its current landscape.

40. The court rejects the attempt to liken the erection of billboards along Sunrise Highway to existing on-site advertising and/or the limited code violations pointed out by Nichols. Instead, this court finds, and the Supreme Court has noted, that billboards, "by their very nature, wherever located and however constructed," are, simply, different. They are designed to "stand out and apart from their surroundings" and therefore "create a unique set of problems for land use planning and development." *Metromedia,*

Inc. v. City of San Diego, 453 U.S. 490, 502, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). There is no doubt that the proposed billboards would create the aesthetic harm sought to be prevented by the sign regulations of the Towns.

E. *Nichols' Application to Erect Billboards within the Towns*

41. On February 26, 2002, Nichols submitted sign permit applications to erect eight signs along Sunrise Highway in Babylon.

42. On March 8, 2002, each of Nichols' sign permit applications were denied by Babylon. Each denial stated that the billboards exceeded the town's size limitations.

43. On February 26, 2002, Nichols submitted permit applications to erect twelve signs along Sunrise Highway in the Town of Islip. Each application was denied by Islip's Code Enforcement Officer who merely marked the applications as "not permitted."

44. Shortly after the denials by the Towns, Nichols commenced this action alleging the unconstitutionality of certain provisions of the Ordinances.

## CONCLUSIONS OF LAW

I. *Prior Litigation Involving The Babylon and Islip Ordinances*

Before turning to the legal conclusions in this matter, the court outlines, briefly, relevant legal issues and holdings derived from the first time that this court and the Second Circuit had occasion to pass upon the constitutionality of Babylon and Islip sign ordinances.

In 1989, several town ordinances, including those of Babylon and Islip, were the subject of litigation between a company engaged in the outdoor advertising business and the Towns. See *National Advertising Company v. Town of Babylon,* 703 F.Supp. 228 (E.D.N.Y.1989), *aff'd in part and rev'd in part,* 900 F.2d 551 (2d Cir. 1990) ("*National Advertising* ").

In *National Advertising,* this court held that Babylon's sign ordinance had an unconstitutional impact on commercial speech because the Town failed to identify any purpose to support the ordinance and its ban on certain types of advertising. This void left the court unable to determine whether the ordinance implemented a substantial governmental interest and therefore led to the conclusion that the ordinance did not pass constitutional muster with respect to its impact on commercial speech. See *National Advertising,* 703 F.Supp. at 236.

This court also held that the portion of the Babylon ordinance limiting property owners to one commercial sign per parcel of property had an unconstitutional impact on non-commercial speech. By not allowing for non-commercial speech to be conveyed, this provision had the effect of favoring commercial speech over non-commercial speech. See *National Advertising,* 703 F.Supp. at 237. On appeal, the Second Circuit agreed that the absence of a statement of intent rendered Babylon's 1989 ordinance constitutionally infirm. *National Advertising v. Town of Babylon,* 900 F.2d 551, 555–56 (2d Cir.1990).

As to the Islip Ordinance, this court held in *National Advertising* that the ordinance passed constitutional muster with respect to its impact on non-commercial speech because: (1) Islip properly relied upon interests in aesthetics and the reduction of motorist distraction as substantial governmental objectives; (2) Islip's ordinance directly advanced these legitimate objectives

and (3) the Islip ordinance was reasonable and no more extensive than necessary to further the town's interest. *National Advertising*, 703 F.Supp. at 235-36.

As to its impact on non-commercial speech, however, this court held Islip's ordinance unconstitutional. Specifically, its was held that Islip's decision to allow only for a single commercial sign advertising on-premises goods or services had the unconstitutional impact of favoring commercial speech over non-commercial speech. *Id.* at 238. This court further held unconstitutional certain content-based exceptions to Islip's ordinance as favoring certain types of commercial speech over others. Specifically, exceptions for temporary political signs, signs identifying a "grand opening, parade, festival, fund drive or similar occasion," were held unconstitutional because they left open the door to the exercise of unfettered discretion by Islip town officials as to whether or not a particular sign was subject to regulation. *Id.* at 239.

On appeal, the Second Circuit agreed that the Islip ordinance improperly favored commercial speech over non-commercial speech. The appellate court noted that Islip could have easily, but failed to, include a provision allowing for the use of non-commercial copy wherever commercial copy is allowed and therefore ran afoul of the law as set forth by the Supreme Court in *Metromedia v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). *National Advertising*, 900 F.2d at 557. The Second Circuit also affirmed this court's holding that certain exceptions in the Islip ordinance, as set forth above, impermissibly discriminated against certain forms of commercial speech based upon content. *Id.* at 556. An exception for real estate signs, however, also held impermissible by this court, was held proper based upon special considerations as to

that form of advertising and the decision of the Supreme Court in *Linmark Associates v. Township of Willingboro*, 431 U.S. 85, 93-94, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). *Id.*

Since *National Advertising*, both Babylon and Islip have amended their sign ordinances. Babylon's ordinance now includes a clear statement of intent. Additionally, the Babylon ordinance now contains a severability clause as well as a provision allowing for the placement of a non-commercial message on any sign where a commercial message is allowed. Islip has amended its ordinance to omit the exceptions held unconstitutional. Like Babylon, Islip has added a provision allowing for the use of non-commercial copy wherever commercial copy is authorized. Presumably, these provisions were passed to ensure that single sign per parcel of land limitations do not run afoul of the First Amendment by favoring commercial over non-commercial speech.

Having outlined the legal backdrop to this litigation, the court turns to address the issues raised here.

## II. *Standing*

■ The court addresses first the issue of standing. Plaintiff claims standing to raise the constitutional issues it sets forth as a facial attack upon the Ordinances. While certain provisions challenged would certainly have no application to Plaintiff, the court holds that the challenges set forth may be raised as facial challenges to the unconstitutionality of the Ordinances. *See Metromedia*, 453 U.S. at 504 n. 11, 101 S.Ct. 2882 (parties with commercial interests may raised facial challenge based upon the non-commercial speech interests of third parties); *see generally Clear Channel Outdoor, Inc. v. Town of Windham*, 352 F.Supp.2d 297, 302 (N.D.N.Y.

2005). Having established standing, the court turns to address the merits of Plaintiff's various challenges.

## III. First Amendment Standards: Impact On Commercial Speech

### A. The Continuing Viability of the Central Hudson Analysis

When considering the impact of the Ordinances on commercial speech, the court applies the four part test announced by the Supreme Court in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Nichols has taken the position that since the Supreme Court's decision in *Central Hudson,* commercial speech "has been elevated to a considerably more important position" than that held at the time of the *National Advertising* litigation. While several years have passed since the *Central Hudson* decision, it is clear that the basic principals set forth in that case remain good law.

When reaching this conclusion, the court is guided by the decision of the Supreme Court in *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). There, the Court considered a ban on the advertising of tobacco products in certain areas. Even though that case involved a content-based ban, the court adhered to the rule that restrictions on commercial speech continue to be properly judged by application of the *Central Hudson* test. Indeed, the Court in *Lorillard* expressly rejected application of a strict scrutiny/least restrictive means test to such regulations. *See Lorillard,* 533 U.S. at 556, 121 S.Ct. 2404.

In view of the foregoing, the court turns to apply *Central Hudson* to analyze the impact of the Ordinances on commercial speech. *See Long Island Bd. of Realtors v. Incorporated Village of Massapequa Park,* 277 F.3d 622, 626 (2d Cir.2002)

(recognizing continuing viability of *Central Hudson* analysis); *Infinity Outdoor, Inc. v. City of New York,* 165 F.Supp.2d 403, 415 (E.D.N.Y.2001) (same).

### B. Application of Central Hudson

■ *Central Hudson* requires the court to consider: (1) whether the advertising is neither unlawful nor misleading and therefore entitled to First Amendment protection; (2) whether the ordinance seeks to implement a substantial governmental interest; (3) whether the ordinance directly advances that interest and (4) whether the ordinance reaches no further than necessary to accomplished its stated goals. *See National Advertising,* 703 F.Supp. at 233.

The court's application of *Central Hudson* is guided by the decision of the Supreme Court in *Metromedia v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), a case involving a local ordinance governing billboard advertising. In *Metromedia,* the Supreme Court recognized that each form of communication is "a law unto itself and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Metromedia,* 453 U.S. at 501, 101 S.Ct. 2882. As noted above, the unique design of billboards "creates a unique set of problems for land-use planning and development." *Metromedia,* 453 U.S. at 502, 101 S.Ct. 2882. Guided by application of the four part *Central Hudson* test and the continuing viability of the Court's decision in *Metromedia,* the court turns to consider the impact of the Ordinances on commercial speech.

As to the first part of the *Central Hudson* test, the court holds that the commercial speech at issue here is neither unlawful nor misleading and therefore entitled to First Amendment protection.

■ The court next considers the second prong of *Central Hudson, i.e.,* whether the Ordinances seek to implement a substantial governmental interest. As noted, interests identified by both Babylon and Islip are aesthetics and traffic safety. Nichols attempted to downplay the traffic safety issue by presenting the expert testimony of Dr. Suzanne Lee, a researcher with the Virginia Tech Transportation Institute. The testimony of Steven Nichols was presented, *inter alia,* on the issue of aesthetics.

Dr. Lee presented the results of a study that she conducted in Charlotte, North Carolina. This study purported to show that driver behavior was not influenced by the presence of billboards. (the "Lee Study"). The Lee Study was funded by the Foundation for Outdoor Advertising Research and Education, a close affiliate of the Outdoor Advertising Association of America, which is the leading trade association for those who erect billboard advertising (the "OAAA"). Trial testimony revealed that representatives of the OAAA were intimately involved in the design and conduct of the Lee Study. Indeed, the results of the Lee Study were presented at a meeting of the OAAA where billboard industry leaders characterized the study as proving "definitively" that billboards do not inhibit driver performance. The Lee Study has been neither widely disseminated nor subject to peer review. Nor have the conclusions of the Lee Study been replicated in any other study.

When considering the testimony of Dr. Lee, the court holds that the Lee Study is so infected by industry bias as to lack credibility and reliability. This conclusion is supported not only by industry involvement in the design and execution of the study but also by the lack of peer review and the fact that there is no other scientific study with the same or similar conclusions regarding driver distraction. For these reasons, the court rejects Dr. Lee's conclusions regarding traffic safety. *Cf. Zaremba v. General Motors Corp.,* 360 F.3d 355, 358 (2d Cir.2004) (upholding district court's exclusion of expert testimony on grounds set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), including failure to show peer review or general acceptance of methodology in relevant scientific community).

■ In an effort to establish the aesthetic value of billboards, or at least, that the proposed billboards would not detract from the Sunrise Highway landscape, Nichols offered the testimony of Steven Nichols. Mr. Nichols opined, essentially, that the billboards planned to be erected on Sunrise Highway in Babylon and Islip were more aesthetically pleasing than other signs in the Towns. He further testified that such signs would result in no diminution in property values. Similar to the testimony of Dr. Lee, the court gives little weight to the testimony of Steve Nichols. That testimony was highly biased. Additionally, as discussed above, the erection of billboards along Sunrise Highway would materially alter, and have a negative impact upon, the existing landscape.

Rather than crediting the testimony offered by Nichols on aesthetics and safety, the court holds that the goals identified by Babylon and Islip, *i.e.,* aesthetics and traffic safety, are "unequivocally substantial governmental objectives" that satisfy the second prong of the *Central Hudson* test. *Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882; *accord Board of Managers of Soho Internat'l. Arts Condominium v. City of New York,* 2004 WL 1982520 *14 (S.D.N.Y. 2004); *Infinity Outdoor, Inc. v. City of New York,* 165 F.Supp.2d 403, 416 (E.D.N.Y.2001).

■ The third prong of *Central Hudson*, whether the regulations at issue "directly and materially" advance the stated goals, requires a demonstration that the ills addressed by the ordinance will be alleviated "to a material degree" by the regulations. *Lorillard,* 533 U.S. at 555, 121 S.Ct. 2404, quoting, *Greater New Orleans Broadcasting Ass'n., Inc. v. United States,* 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161. This demonstration can be supported by studies, anecdotes or "simple common sense." *Id.,* quoting, *Florida Bar v. Went for It, Inc.,* 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995).

In *Metromedia,* the Supreme Court rejected the argument that the city failed to show any connection between its interests and the regulation of billboard advertising. Instead, the Court agreed with the legislative judgment of the local legislature that billboards endanger both traffic safety and the city's aesthetic interests. *Metromedia,* 453 U.S. at 508–10, 101 S.Ct. 2882. Additionally, as stated in *Metromedia,* "it is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Metromedia,* 453 U.S. at 510, 101 S.Ct. 2882. This court and others have agreed that a ban on off-site commercial speech directly advances the governmental interests of safety and aesthetics. *See National Advertising,* 703 F.Supp. at 236; *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604, 611 (9th Cir.1993) (noting that ordinance banning all off site advertising "directly advances government's interests in safety and aesthetics" and upholding ordinance that allowed offsite commercial advertising only in certain designated parts of the city and prohibited such signs in other zoning classifications); *see also Lavey v. City of Two Rivers,* 171 F.3d 1110, 1115–16 (7th Cir.1999) (constitutionally

permissible to limit the placement and size of outdoor advertising); *Infinity Outdoor,* 165 F.Supp.2d at 422 (upholding New York City ordinance limiting the placement and size of billboard advertising). In sum, this court, like the Supreme Court in *Metromedia,* holds that the Ordinances directly advance the goals of avoiding driver distraction and improving the Towns' aesthetics and therefore satisfy the third prong of the *Central Hudson* test.

■ Turning to the fourth prong of *Central Hudson, i.e.,* whether the Ordinances reach no further than necessary to accomplish their stated objectives, the court holds that the Ordinances are "reasonable and not more extensive than required" to further their stated goals. *National Advertising,* 703 F.Supp. at 236.

Although a plurality opinion, five Justices of the Supreme Court agreed in *Metromedia,* that it would be consistent with the Constitution to prohibit all off site commercial advertising. *See Metromedia,* 453 U.S. at 508, 101 S.Ct. 2882; *See National Advertising Company v. Town of Niagara,* 942 F.2d 145, 147 (2d Cir.1991) (noting that a majority of the *Metromedia* Court held that First Amendment is not violated by an ordinance that allows onsite commercial speech but forbids offsite commercial speech). Thus, the Court stated that if the City had sufficient basis for believing that billboards present an aesthetic harm, "obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Metromedia,* 453 U.S. at 508, 101 S.Ct. 2882. The Supreme Court has made clear that the final prong of *Central Hudson* does not require a showing that the legislating entity has employed the "least restrictive means" to accomplish its goals. *See Lorillard,* 533 U.S. at 554, 121 S.Ct. 2404. So long as there is a reason-

able fit between the means chosen and the ends identified, the regulation meets the fourth prong of this test. *Id.* at 556, 121 S.Ct. 2404; *see Infinity Outdoor,* 165 F.Supp.2d at 419–20. The required reasonable fit exists between the interests of both Babylon and Islip and their respective regulations.[1]

For the foregoing reasons, the court holds that the Ordinances do not have an unconstitutional impact on commercial speech.

## IV. *The Impact of the Ordinances on Non–Commercial Speech*

Plaintiff makes various arguments regarding the impact of the Ordinances on non-commercial speech. Certain arguments are directed toward both Towns, others are town-specific. The court will consider first those arguments directed at both Towns. The common arguments set forth by Nichols are: (1) the Ordinances are unconstitutional because those charged with the granting of sign permits have the unfettered discretion to make content-based distinctions; (2) the use of the words "obscene," "pornographic," "commercial" and "non-commercial" render the Ordinances unconstitutionally vague; (3) the Towns' permit fees place an unconstitutional tax on the exercise of First Amendment rights; (4) Babylon's decision to carve out limited exceptions to the Ordinance that apply only in the Town's "Commercial Overlay District" and Islip's ban on off-site advertising both violate the Commerce Clause of the Constitution and (5) the exemption of government signs

from the Ordinance (whether express or *de facto*) is the type of unconstitutional favoring prohibited by the Supreme Court in *Metromedia.*

After considering the arguments common to both Towns, the court will consider those raised only with respect to Islip. As to that ordinance, Plaintiff makes the additional arguments that: (1) the use of certain terms (in addition to those terms raised as objectionable that are common to both Ordinances) create content-based distinctions vesting Islip officials with unconstitutional discretion and (2) the limit of a single sign per parcel of property favors commercial over non-commercial speech.

### A. *Arguments Raised as to Both Babylon and Islip*

#### 1. *Alleged Content–Based Distinctions*

██ Local government may impose content-neutral prohibitions on the exercise of speech. It is impermissible, however, to condition the expression of speech on obtaining a license where the grantor of the license has unbridled discretion in determining whether or not a license shall be granted. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 764–65, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Vesting a government official with such discretion leaves the door open for that official to unconstitutionally censor certain viewpoints. *Id.* at 764, 108 S.Ct. 2138. Plaintiff's general argument on this issue comes down to the facile notion that because the content of a sign must be read prior to the granting of a permit, the

---

1. Babylon also identifies maintenance of property values as an interest furthered by its regulation. Islip too identifies additional interests such as providing for uniform design standards and limiting the use of energy in sign design and maintenance. *See* Islip Code § 68–394(D) and (G). The court need not consider whether each goal identified is furthered by the ordinance. It is sufficient, for *Central Hudson* purposes, that any one of the goals identified is properly furthered. The court notes, however, that each goal identified in both the Babylon and Islip ordinances are, indeed substantial governmental goals that are properly furthered by the Ordinances.

official reading the sign copy is vested with unfettered discretion to make content-based distinctions.

▆ Plaintiff relies on the following testimony to support the notion that both Ordinances contain content-based distinctions that lead to the exercise of unfettered discretion by Town officials reviewing permit applications. With respect to the Babylon Ordinance, Nichols relies upon the following exchange:

Q: Would you agree with me you would have to read the content or copy of the sign in order to determine whether it fit within [the ban off-premises advertising]?

A. Yes.

Nichols cites to similar testimony from an Islip official in support of the notion that reading a permit application translates to the conclusion that the Islip Ordinances makes impermissible content-based distinctions.

Q: And how do you tell the difference between a real estate sign and a business sign?

A: Well, basically the real estate sign would have the name of the real estate company and for sale of the property.

Q: So, you have to read the sign?

A: Yes.

Q. So, you distinguish between signs based on what is written on the sign, correct?

A. Yes.

The "reading" referred to at trial and relied upon in Nichols' post-trial submissions, is not the type of content-based reading determination that has been held to vest unconstitutional discretion in officials. While the court acknowledges that a permit application must be read before it is granted, the court holds that the mere fact that copy must be read to determine whether a permit should issue does not, standing alone, mean that the Ordinances make content-based distinctions. In addition to the examples above, Town officials must read permit applications to determine whether a sign meets lighting and/or size specifications. Such reading does not transform a lighting or size requirement into an impermissible content-based distinction and/or give the official unfettered discretion as to whether or not to grant a permit application.

To further illustrate this point, the court contrasts the reading relied upon at trial with reading held unconstitutional in *Clear Channel Outdoor, Inc. v. Town of Windham*, 352 F.Supp.2d 297 (N.D.N.Y.2005). There, the court held that the reading of a permit application was geared toward making a content-based determination and was therefore unconstitutional. In that case, however, the town official was required to read sign copy to determine whether, for example, the proposed sign called attention to an "event of a public nature," the meeting of a "fraternal organization" or a "social event." *Id.* at 308.

Here, with the exception of certain portions of the Islip Ordinance discussed below, compliance with the Towns' sign regulations requires only the reading of applications to determine content neutral information such as size, location and whether or not the sign calls attention to a service performed on the premises where the sign is to be located. These determinations are a far cry from those content-based distinctions that will render an ordinance unconstitutional. At trial, Nichols made no showing that any improper reading or judgment was necessary to reach a decision concerning issuance of a permit. Accordingly, the court rejects the argument that the mere reading of an application by Town officials

vests those officials with unfettered discretion to determine the speech that my be disseminated within the Towns.

2. *Vagueness: Both Towns' Use of the Terms "Obscene" "Pornographic" "Commercial" and "Non–Commercial"*

 Plaintiff next argues that the Ordinances' use of the words "obscene" "pornographic" "commercial" and "non-commercial" renders them unconstitutionally vague. The court disagrees.

A statute will beheld unconstitutionally vague if it "fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Nitke v. Ashcroft,* 253 F.Supp.2d 587, 608 (S.D.N.Y.2003), quoting, *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Where, as here, words have been given judicial standards by which to be judged, a vagueness challenge fails.

 Turning first to the Ordinances' prohibition on obscene or pornographic signs, the court notes that the Constitution does not protect such speech and that states have a right to regulate obscenity without running afoul of the First Amendment. *Miller v. California,* 413 U.S. 15, 18–19, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Dial Information Servs. Corp. of New York v. Thornburgh,* 938 F.2d 1535, 1538 (2d Cir.1991). The Supreme Court has endeavored to define obscenity and pornography so that state statutes can conform to constitutional requirements regarding vagueness and avoidance of prior restraint of constitutionally permissible speech. *See Miller,* 413 U.S. at 24, 93 S.Ct. 2607. A statute's use of the term

"obscenity" has been noted to inherently contain within it a reference to specifically defined conduct so that particular words need not be spelled out when this term is used. *Hamling v. United States,* 418 U.S. 87, 118–19, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (rejecting argument that use of "obscenity" in a criminal statute was so vague as to fail to put the defendant on notice of conduct that would be considered illegal); *see Dial Information,* 938 F.2d at 1540; *Nitke,* 253 F.Supp.2d at 608–09. In light of this precedent the use of the terms "obscene" or "pornographic" do not render the Ordinance unconstitutionally vague.[2]

 As to the Ordinances' use of the terms "commercial" and "non-commercial," the court holds that these terms are appropriate to use in any provision regulating speech. The Supreme Court has used the terms "commercial" and "non-commercial" when discussing permissible state regulation of speech. Thus, First Amendment jurisprudence has long recognized, and continues to recognize, that different standards apply to each type of speech. *See Lorillard,* 533 U.S. at 553–55, 121 S.Ct. 2404. That government officials are charged with making distinctions between commercial and non-commercial speech does not render legislation defective. *Accord City of Mesa,* 997 F.2d at 623 ("potential difficulty" of categorizing types of speech does not render ordinance unconstitutional); *Infinity Outdoor,* 165 F.Supp.2d at 424 ("infrequent possibility" of an official wrongly deciding that speech fell into the wrong category "should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area"), quoting, *Children of the Rosary v.*

---

2. The Supreme Court has noted that the statutory use of the word "obscene" is most commonly used to refer to material that is pornographic in nature. *Miller,* 413 U.S. at 19 n. 2, 93 S.Ct. 2607. Thus, the court finds that neither the use of the word "obscene" nor of the word "pornographic" render the Ordinances unconstitutionally vague.

*Phoenix,* 154 F.3d 972, 983 (9th Cir.1998); *see also Lavey v. City of Two Rivers,* 171 F.3d 1110, 1116 (7th Cir.1999) (requirement that sign enforcement administrator make distinctions between commercial and non-commercial speech neither renders ordinance unconstitutionally vague nor gives government official unbridled discretion). For the foregoing reasons, the court rejects the argument that the Ordinances' use of the terms "obscene" "pornographic," "commercial" and "non-commercial" render either of the Ordinances unconstitutionally vague.

### 3. *Permit Fees*

 Plaintiff next challenges the Towns' permit fees as placing an unconstitutional tax on the exercise of First Amendment rights. Peter Casserly, the Babylon Commissioner of Planning and Economic Development testified clearly, and without contradiction, that the amount of sign permit fees collected by Babylon are significantly less that the costs of administering and enforcing its Ordinance. Under these circumstances, the permit fee structure is not an impermissible tax on the exercise of First Amendment rights. *See Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767, 774 (2d Cir.1984); *Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.1983); *Mobile Sign, Inc. v. Town of Brookhaven,* 670 F.Supp. 68, 74 (E.D.N.Y. 1987).

As to Islip, no witness was called to justify the permit structure. The court desires to obtain additional evidence to properly decide this issue. Accordingly, Islip is ordered to produce a witness with knowledge, similar to the witness produced by Babylon, so that the court can properly evaluate the merits of this claim. Pending this additional testimony, the court will hold in abeyance its decision on the issue of the constitutionality of the Islip permit structure.

### 4. *Commerce Clause Arguments*

Nichols lodges attacks to both Ordinances based upon the Commerce Clause of the Constitution (the "Commerce Clause"). The attack to the Babylon Ordinance is based upon the town's allowance of off-premises advertising in a limited commercial district. With respect to Islip, the argument is broader, arguing that the general ban on off-site advertising violates the Commerce Clause. After describing the Babylon district at issue, the court will turn to the merits of the argument.

### i. *Babylon's Commercial Overlay District*

Babylon's legislative body has made a decision to carve out a particular district in which the total ban on off-site advertising does not apply. As noted, that exception appears in Article 34 of the Babylon Town Code and allows for off-premises advertising under certain circumstances in the Commercial Overlay District (the "District"). Of the four requirements set forth for the granting of a special exception, Plaintiff attacks one as unconstitutional. Specifically, it is argued that the requirement that the proposed sign advertise only for an enterprise located within the District results in an unconstitutional favoring of interests located within New York State over those located out of state and therefore violates the Commerce Clause. With respect to the Town of Islip, it is argued that the general ban on off-premises advertising violates the Commerce Clause.

### ii. *Analysis of Commerce Clause Argument*

 Plaintiff's Commerce Clause argument is based upon the "dormant" or

"negative" aspect of the clause which invalidates state regulations that stand as barriers to interstate trade. *Oregon Waste Systems, Inc. v. Department of Environmental Quality of the State of Oregon,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *American Booksellers Foundation v. Dean,* 342 F.3d 96, 102 (2d Cir.2003). This doctrine holds that when a state regulation discriminates against, or places an unjustifiable burden on, the flow of goods interstate, that regulation will be held unconstitutional under the Commerce Clause. *Gary D. Peake Excavating, Inc. v. Town of Hancock,* 93 F.3d 68, 73 (2d Cir.1996).

When analyzing a state regulation under the Commerce Clause, the first question is whether the regulation is discriminatory on its face. Such discrimination exists if the regulation treats in-state economic interests differently than economic interests from out of the state. *Oregon Waste,* 511 U.S. at 99, 114 S.Ct. 1345. Discriminatory regulations are subject to a strict scrutiny analysis and have been held to be virtually *per se* invalid. *Id.* Nondiscriminatory regulations, on the other hand, which have only an "incidental burden" on interstate commerce are a valid exercise of state power unless they impose a burden on commerce that is "clearly excessive in relation to the putative local benefits." *Id.,* quoting, *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

The line between those exercises of state power that are facially discriminatory and therefore analyzed under strict scrutiny, and those subject to a balancing approach, is not easily drawn. *American Booksellers,* 342 F.3d at 102. The issue dividing these two categories is the "overall effect" of the state regulation on "both local and interstate activity." *American Booksellers,* 342 F.3d at 102, quoting,

*Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).

Examples of statutes held to be facially discriminatory and violative of the Commerce Clause are those that subject marketers of out-of-state land or services to requirements that are more stringent than requirements imposed upon in-state sellers. While these cases recognize a state's interest in protecting its residents from fraud, they hold that the disparate treatment of in-state and out-of-state sellers places an undue burden on the flow of commerce and violates the Commerce Clause. *See, e.g., Old Coach Development Corp., Inc. v. Tanzman,* 881 F.2d 1227, 1232–34 (3d Cir.1989) (holding land sale disclosure requirements imposed only with respect to land located outside of state to be invalid under Commerce Clause); *Cranberry Hill Corp. v. Shaffer,* 629 F.Supp. 628, 635 (N.D.N.Y.1986) (same); *see also American Camping Association, Inc. v. Whalen,* 554 F.Supp. 396, 399 (S.D.N.Y.1983) (holding disclosure requirements applied only to out-of state camps invalid under Commerce Clause).

It is this line of cases upon which Nichols relies in arguing against both Ordinances. The court finds the cases relied upon inapposite and disagrees. First, Babylon's regulation allowing for limited off-site advertising in the District makes a distinction not solely between in-state and out-of-state advertisers, but between in-District and all other advertisers, including those located throughout the Town and, indeed, throughout the State of New York. Similarly, Islip's ordinance distinguishes only between on-premise and off-premise advertisers. Thus, both of the Ordinances make distinctions that bar advertising by out-of-state as well as in-state businesses.

While out-of-state advertisers are, indeed, prohibited from off-site advertising

in the District and in Islip, this fact, standing alone, does not lead the court to conclude that either Ordinance is discriminatory on its face and that strict scrutiny analysis applies.

■ Instead, the court considers, as set forth in *Brown–Forman,* the "overall effect of the [Ordinances] on both local and interstate activity." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080. That effect is, unquestionably, minimal. The mere fact that out of state advertisers cannot place signs in the District or on the premises of businesses within Islip Town, has little effect on whether these interests are able to communicate their message to those located within the State of New York. There are numerous other outlets for such advertising, not the least of which is the internet, which allows advertisers from around the world to communicate with New York residents, including those who happen to drive past the District.[3]

Because the effect on both local and interstate commerce of the ban on off-premises advertising in Islip and the exception carved out by Babylon in Article 34 is minimal, the court applies the *Pike* balancing test to determine the constitutionality of the Towns' legislation under the Commerce Clause. Under that test, the exception is invalidated only if the burden on interstate commerce "clearly exceeds the local benefit." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080, quoting, *Pike,* 397 U.S. at 142, 90 S.Ct. 844. The benefit of the Islip ban on off-premises advertising has been clearly outlined in the court's *Central Hudson* analysis and will not be repeated here. Similarly, the benefit of Article 34 is clear. It recognizes that the logistics of the District might result in some businesses being hidden from view. Individuals looking for

these places of business would be unable to find them in the absence of an off-premise sign. The exception crafted to the ban on off-site advertising is narrowly tailored to meet this need. Thus, Article 34 allows for an off-site sign only if there is a "special need" for the sign because the business advertised "is isolated and/or not visible from a main thoroughfare, and because such location substantially and detrimentally affects the viability of such business ...." Babylon Town Code Art. XXXIV § 213–418.14(B)(4).

When the needs of the Towns are balanced against the minimal effect of the sign regulations on interstate commerce, the court holds that the Towns' actions are valid exercises of State power that do not violate the Commerce Clause.

5. *Exemption for Governmental Signs*

■ Nichols challenges the actions of both Babylon and Islip with respect to governmental signs. Babylon's ordinance contains an express exception for governmental signs. While the Islip ordinance contains no similar provision, the testimony made clear that the Islip ordinance is not enforced with respect to signs posted by the town's government.

When considering the decision to exempt governmental signs from the Ordinances, the court considers both whether the exemption favors commercial speech over non-commercial speech and /or certain types of non-commercial speech over others. *Metromedia,* 453 U.S. at 512–14, 101 S.Ct. 2882; *National Advertising,* 900 F.2d at 556–57; *Town of Windham,* 352 F.Supp.2d at 305. A finding of either type of favoring would be inconsistent with constitutional requirements.

---

**3.** The court notes that large scale billboard advertising of the type proposed by Nichols

would not be allowed even for businesses located within the District or on-site in Islip.

Nichols' argument that the Towns' decision to fully exempt governmental signs from sign regulation has merit. As demonstrated at trial, the broad governmental sign exemption has resulted in instances where the Towns have erected signs that violate the Ordinances. Thus, the evidence at trial showed that the Town of Babylon has taken no action against a portable and oversize government sign located outside of the Babylon Town Hall that lists the names of Town legislators. Similarly, it appears that Islip has not enforced the ban on off-premises advertising against signs erected by its government.

While signs erected by the Towns likely convey helpful information regarding the location of services and the identity of Town officials, the Towns may not allow their governments to run completely afoul of the Ordinances. These governmental exemptions result, at least, in the favoring of certain types of commercial speech over others. They can also result in the favoring of certain types of non-commercial speech over others.

For example, if a commercial establishment in either Babylon or Islip wished to erect a sign conveying a non-commercial message on its premises, it could certainly do so. Indeed, provisions in the Ordinances, allowing for the use of non-commercial copy wherever commercial copy is allowed, passed in the wake of the *National Advertising* litigation, specifically allow for such signs. Those signs, however, would be required to comply with all other requirements of the Ordinances, including size and lighting limitations. A sign erected by either the Babylon or Islip Town governments, however, would have no such restrictions regarding size and illumination. By freeing governmental signs from the reach of the Ordinances, the Towns have created an impermissible distinction that favors the Towns' speech over that of other speakers. For this reason, the broad exemption of governmental signs is unconstitutional.

The cases cited by Babylon in support of the governmental exception do not compel a different result. While *Lavey v. City of Two Rivers*, 171 F.3d 1110 (7th Cir.1999) appears to approve of a governmental exception to regulation, the opinion does not discuss the precise regulation at issue. Further, the holding appears only in a footnote and is grouped together with the court's holding approving of exceptions for other signs, including construction signs and those bearing house numbers. *Id.* at 1115 n. 7. *Messer v. City of Douglasville*, 975 F.2d 1505 (11th Cir.1992), also relied upon by Babylon, held only that it was permissible to exempt certain signs, including those for "public" institutions, from an ordinance's permit requirements. *Id.* at 1511–12. Similarly, *Lamar Advertising v. City of Douglasville*, 254 F.Supp.2d 1321 (N.D.Ga.2003), did not endorse a broad governmental exemption from regulation. Indeed, in that case, it was held that allowing the government to post flags, while denying that same right to other entities, was an unconstitutional content-based restriction. *Id.* at 1332.

In sum, neither the cases relied upon, nor the court's research reveals any case, binding or otherwise, holding that it is constitutionally permissible to exempt the government from the same restrictions on speech placed upon all others. Indeed, *Metromedia*, while not deciding the precise issue here, noted that the San Diego ordinance at issue contained a provision allowing for various non-commercial signs, including "signs erected in discharge of any governmental function." *Metromedia*, 453 U.S. at 514, 101 S.Ct. 2882. When commenting on these exemptions to San Diego's ban on off-site advertising, the

Court noted that the government was not free to pick and choose among the non-commercial messages that can be disseminated through billboard advertising. "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Metromedia,* 453 U.S. at 514, 101 S.Ct. 2882, quoting, *Consolidated Edison Co. v. Public Service Comm'n.,* 447 U.S. 530, 538, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). Here too, the broad exception from regulation allows the Towns' governments to communicate ideas to the public in ways that other speakers may not. This is an exception that cannot withstand constitutional scrutiny.

This is not to say that the Towns should be prohibited from erecting signs conveying important information as to the location of services and the identity of those elected to serve the public. Those signs, however, must be subject to the same requirements as signs sought to be erected by non-governmental entities. Additionally, communication of these important public service messages may require that certain signs exceed size and location parameters set forth in the Towns' regulatory schemes. Thus, from time to time, the Towns may seek exemption from any specific requirement by pursuing the same channels of review available to all citizens. Further, the Towns may be able to draft narrowly tailored exemptions to their Ordinances that could pass constitutional muster. Such narrow exceptions might constitutionally exempt limited types of governmental signs from certain requirements. The court will not speculate here as to which particular exemption would be valid. In-

stead, the court holds only that a broad exemption of all Governmental signs from the Ordinances cannot stand.

B. *Arguments Raised Only With Respect to Islip*

1. *Allegedly Vague Terms Used by Islip*

While the court has found that no terms used by Babylon are unconstitutionally vague, the court's review of the Islip Ordinance reveals that there are certain isolated terms that are too vague to pass constitutional muster. Specifically, the court holds that Islip's use of the term "immoral" is too vague to pass constitutional scrutiny. To the extent that this terms goes further than the Supreme Court's definition of obscenity and pornography it must be struck as an unconstitutional limit on protected speech. The court holds further that the terms "institutional" (which includes signs of undefined "clubs" and "associations") and "historic" signs as among those signs that are permitted, are terms too vague to give notice to the public as to which type of sign is permitted in Islip.

Finally, the court holds that the use of the term "public interest" when describing cautionary signs renders that provision of Islip's ordinance unconstitutionally vague. While Babylon's ordinance also contains a provision allowing for "cautionary" signs, such as signs stating "Beware of Dog," or "No Trespassing," its ordinance is not so broad as to refer to all "public interest" signs. The inclusion of this broad and undefined term in Islip's ordinance renders that regulation too vague.[4]

---

4. The court notes that Nichols has lodged a broad attack on nearly every provision of the Islip ordinance. The court will not discuss each and every word used in the ordinance. The court has reviewed the entire ordinance and holds only that the terms discussed above are unconstitutionally vague.

## 2. *Single Sign Limitation*

■ The final issue addressed by the court is Plaintiff's argument that Islip's decision to limit the number of ground signs to one for each parcel of property is an unconstitutional limit on non-commercial speech. While Plaintiff recognizes that the Islip Ordinance allows for the use of non-commercial copy wherever commercial copy is authorized, Plaintiff rejects this amendment as a cure for the burden that the single sign limit places on the expression of non-commercial ideas. Nichols' argument relies upon the notion that a business or property owner who can place only a single sign on his land will likely chose a sign that furthers his own economic interest. Therefore, a property owner will be more likely to use his one sign limit to place a commercial sign on his property than a sign communicating a non-commercial message. Thus, it is argued, the one sign limitation unconstitutionally places a higher value on commercial than non-commercial speech.

This precise argument was raised before the court in *National Advertising*. There, this court first noted that a provision limiting the number of signs that may be placed on a parcel of land is an appropriate content neutral "time, place and manner" restriction. *See National Advertising*, 703 F.Supp. at 239. When considering the argument that a landowner's preference to further his commercial interests leads to an improper value of commercial over non-commercial speech, this court held that the one sign limit was constitutional because it leaves the landowner free to make any decision he chooses. That decision is "a function of economic forces" and not of the municipality's belief that a commercial message has a greater value than one that is non-commercial. *National Advertising*, 703 F.Supp. at 240.

The same decision was reached by the Court of Appeals for the Ninth Circuit in *City of Mesa*. There, the court characterized the notion that a landowner would always prefer to use his property to convey a commercial message as "resting entirely on speculation." *City of Mesa*, 997 F.2d at 612. This court agrees and adheres to the decision reached on this issue in *National Advertising*. The single sign limitation does not unconstitutionally favor commercial over non-commercial speech.

## V. *Severability*

■ In view of the fact that the court has held unconstitutional various provisions of the Ordinances, it becomes necessary to address the issue of severability. The Ordinances of both Towns contain severability clauses. Those clauses state, generally, that if any portion of the Ordinances are found to be in conflict with any law, that provision may be severed and that such severance shall not affect the validity of any other part of the Ordinance that can be given effect without the invalid provision. *See* Babylon Code Art. XXXIII § 213–416; Islip Code § 68–403.1.

The court will honor the severability clauses so long as the valid and invalid portions of the Ordinances are not so "intertwined" that severance of the invalid portion leaves the regulatory scheme in a manner unintended by the legislative body. Nor will the court sever the invalid portion if such severance amounts to a judicial rewriting of the Ordinance. *See National Advertising*, 900 F.2d at 557–58. "The critical issue is whether the legislation would have been enacted if it had not included the unconstitutional provision." *Id.* at 557, quoting, *United States v. Jackson*, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

Here, with respect to both Babylon and Islip, the court has held unconstitutional

the governmental exceptions. Severance of these provisions leaves the regulatory schemes intact and does not interfere with the judgment of the local legislatures regarding the placement of signs within the Towns. It merely includes government signs within those schemes. Accordingly, the court holds that it is appropriate to honor the severability clauses and excise the governmental sign exceptions.

With respect to Islip, the court has held as unconstitutionally vague the terms "immoral," "institutional," "historic" and "public interest." Each of these terms can be struck from the Islip Ordinance without effecting the remainder of the regulatory scheme. Accordingly, these terms are severed from the Islip Ordinance.

With the exception of the severance of the provisions referred to above, the Towns' Ordinances are upheld as a constitutional exercise of the power of the local governments of Babylon and Islip.

*CONCLUSION*

For the foregoing reasons, the court upholds the constitutionality of the Babylon sign ordinance in all respects except for the governmental sign exception. The Islip Ordinance is held to include a *de facto* exemption for governmental signs which is similarly declared invalid. Further, Islip's Ordinance includes certain unconstitutionally vague terms as set forth above. All provisions held unconstitutional are hereby severed from the Ordinances. Finally, with respect to Islip, the court has held in abeyance the issue of the constitutionality of the town's permit structure. The parties are to confer and contact the court within two weeks of the date of this order to schedule the taking of additional testimony on this issue.

In view of the fact that the Ordinances remain intact and prohibit the billboards Nichols wishes to erect, the decision of the Towns denying the sign permit applications will stand. The Clerk of the Court is directed to terminate any outstanding motions and to close the file in this matter at this time. The file may be re-opened upon the conclusion of the taking of the additional testimony contemplated herein.

SO ORDERED.